**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ROY THOMPSON, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:22-cv-03451 |
| HARRIS COUNTY, TEXAS, | § | |
| CHRISTOPHER ORTEGA, and | § | |
| JONDONAVAN VICKERS-GILBREATH, | § | |
| | § | |
| *Defendants*. | § | |

**(PROPOSED)
SECOND AMENDED COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff **ROY THOMPSON** (hereinafter "Thompson" or "Mr. Thompson"), and files this Second Amended Complaint against Defendant **HARRIS COUNTY, TEXAS** (hereinafter referred to as "Harris County," or "the County"), Defendant **CHRISTOPHER ORTEGA** (hereinafter "Ortega"), and Defendant **JONDONAVAN VICKERS-GILBREATH** (hereinafter "Vickers"). In support of such, Plaintiff would show as follows:

[CONTINUED NEXT PAGE]

1

## I.    TABLE OF CONTENTS

I.    TABLE OF CONTENTS ............................................................... 2

II.    STATEMENT OF THE CASE ...................................................... 4

III.    JURISDICTION AND VENUE ..................................................... 5

IV.    PARTIES ................................................................................... 5

V.    RELEVANT BACKGROUND ......................................................... 5

    A.    THE DECEDENT'S INCIDENT ......................................... 5

    B.    PROCEDURAL HISTORY ................................................. 8

VI.    CAUSES OF ACTION ................................................................. 11

    COUNT 1 – UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT .......... 11

    COUNT 2 – *MONELL* PATTERN-OR-PRACTICE ...................................... 13

        A.    THE POLICY OR CUSTOM ................................................ 13

            i.    INSTITUTIONALIZATION OF EXCESSIVE FORCE ........ 14

            ii.    THE DENIAL OF ADEQUATE MEDICAL CARE ............... 15

            iii.    FAILURE TO PROPERLY OBSERVE, MONITOR
                DETAINEES ............................................................... 16

            iv.    OVERCROWDING AND UNDERSTAFFING ..................... 17

        B.    THE POLICYMAKERS KNEW OR SHOULD HAVE KNOWN .... 18

            i.    THE TEXAS ADMINISTRATIVE CODE ............................ 18

                a.    SUPERVISION REQUIREMENTS ................................. 19

                b.    PROVISION OF HEALTHCARE REQUIREMENTS ... 19

            ii.    THE DEPARTMENT OF JUSTICE REPORT ...................... 21

            iii.    TEXAS COMMISSION ON JAIL STANDARDS REPORTS 23

            iv.    LAWSUITS AND SETTLEMENTS ...................................... 30

            v.    PUBLIC STATEMENTS OF THE POLICYMAKERS ......... 31

            vi.    SUBSEQUENT EVENTS ALSO SHOW DISPOSITION ...... 33

        C.    CONSTITUTIONAL VIOLATION AND MOVING FORCE ........... 35

            i.    THE CONSTITUTIONAL VIOLATION .............................. 35

            ii.    MOVING FORCE ............................................................... 37

    COUNT 3 – FAILURE TO SUPERVISE ................................................... 38

        A.    THE FAILURE TO SUPERVISE AND CAUSAL CONNECTION . 38

        B.    DELIBERATE INDIFFERENCE ......................................... 39

            i.    PATTERN OF PRECEEDING INCIDENTS ........................ 40

      ii.     CONDUCT AFTER THE EVENTS ......................................... 48

  COUNT 4 – FAILURE TO TRAIN ................................................................... 66

  COUNT 5 – EXCESSIVE FORCE .................................................................... 69

     A.    EXCESSIVE FORCE ELEMENTS...................................................... 69

     B.    NO QUALIFIED IMMUNITY .............................................................. 70

  COUNT 6 – FAILURE TO INTERVENE.......................................................... 72

     A.    BYSTANDER LIABILITY ELEMENTS MET ................................. 72

     B.    NO QUALIFIED IMMUNITY .............................................................. 72

  COUNT 7 – EPISODIC ACTS ......................................................................... 73

VII.  ATTORNEY'S FEES ........................................................................................ 73

VIII.  JURY REQUEST ............................................................................................. 74

IX.  DAMAGES ...................................................................................................... 74

X.  PRAYER .......................................................................................................... 74

## II.    STATEMENT OF THE CASE

1.    Thompson brings forth claims for damages pursuant to 42 U.S.C. § 1983, and for attorney's fees under 42 U.S.C. § 1988.  The purpose of § 1983 is to deter state actions from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.  _Garza v. Guerra_, 2010 U.S. Dist. LEXIS 63632 (S.D. Tex. 2010) (Hanen, A.) (noting the same).

2.    Furthermore, Thompson's specific § 1983 claims seeking judicial relief are the same as those in _Wagner v. Harris Cnty._, 2024 U.S. Dist. LEXIS 98779 (S.D. Tex. 2024) (Ellison, K.) (hereinafter "_Wagner II_") (finding that twenty-seven (27) plaintiffs had sufficiently pled conditions of confinement and _Monell v. Dep't of Soc. Servs._, 436 U.S. 658 (1977) claims against Harris County for its conduct at 1200 Baker against pre-trial detainees), and _Wagner v. Harris Cnty._, 2024 U.S. Dist. LEXIS 68793 (S.D. Tex. 2024) (Ellison, K.) (hereinafter "_Wagner I_") (permitting other pre-trial detainees to intervene as plaintiffs pursuant to Fed. R. Civ. P. 24(b)).

3.    As alleged in more detail herein below, the Defendants are charged with 6 counts of violation of federal law; namely, 1) a claim for Unconstitutional Conditions of Confinement; 2) a _Monell_ Pattern-or-Practice claim (for policy or custom, institutionalization of excessive force, denial of adequate medical care, among others); 3) a Failure-to-Supervise claim; 4) a Failure-to-Train claim; 5) an Excessive Force claim against the individually named officers; and 6) a Failure-to-Intervene, also against the individually named officers. The details of these claims are stated with clarity below.

4.    Out of an abundance of caution, and as allowed by Fed. R. Civ. P. 8(a)(3), Thompson alternatively brings "episodic acts" claims against all Defendants.

### III.   JURISDICTION AND VENUE

5.      This action is brought pursuant to 42 U.S.C. §1983 and §1988 and under the Fourth Amendment to the United States Constitution, made applicable to the Defendants through the Fourteenth Amendment to the United States Constitution.  This Court thus has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.  Venue is proper in this Court pursuant to § 1391(b) because the incident in question took place in Harris County, Texas, within the Southern District of Texas.

### IV.   PARTIES

6.      Plaintiff Roy Thompson is an individual and resident of Texas, and has previously made an appearance in this lawsuit.

7.      Defendant Harris County is the government entity responsible for the Harris County Sheriff's Office which, in turn, is responsible for the administration of the Harris County Jail where the Plaintiff, the Plaintiffs, and the Decedents all suffered their injuries.  Harris County is located in the Southern District of Texas.  Harris County has previously appeared in this lawsuit.

8.       Defendant Christopher Ortega is an individual and resident of Texas, and has previously made an appearance in this lawsuit.

9.      Defendant Jondonavan Vickers-Gilbreath is or was a jailer of Defendant Harris County, and may be served with process wherever he may be found.

### V.   RELEVANT BACKGROUND

#### A.   THE DECEDENT'S INCIDENT

10.      In January 2022, Thompson was a pretrial detainee Harris County's jail and was specifically housed at the 1200 Baker Street building.  On January 28, 2022, Thompson "was asleep on [his] bunk and [Defendant Vickers] woke [him] up and told [him] to get [his] ass in the

dayroom," and Thompson did so.  Doc. 29, Pg. 1 ¶ 2.  There, Defendant Ortega "told [him] to get [his] dumb ass in line with the other inmates," and Thompson did so.  Doc. 29, Pg. 2 ¶ 2.

11.     When the two jailers, Ortega and Vickers, "began to approach" Thompson "aggressively," he cooperated, "turned around and placed [his] hands behind [his] back," and erroneously believed that he was "being handcuffed… for [his] safety."  Doc. 29, Pg. 2 ¶ 2, Thompson did whatever he could to show them he "was not trying to be combative."  Doc. 29, Pg. 2 ¶ 2.  To be clear, Thompson had no weapons or sharp objects on him.  Doc. 29, Pg. 3 ¶ 5. Defendants then "escorted" him to the "vestibule."  Doc. 16, Pg. 1 ¶ 2; Doc. 29, Pg. 2 ¶ 2.  This area is a known blind spot, because there is no surveillance camera that can reach the "blind spot," and the lack of visibility of that precise spot gives comfort to jail assailants that they will not be brought to account, and so the location in the jail makes it ideal for abusive behavior against inmates by the County's staff.

12.     There, in that "blind spot," the Defendants viciously beat him without reason for at least 45 seconds.  To be exact, Defendant Vickers abruptly with overwhelming unnecessary force "elbowed [him] in the back of the head."  Doc. 29, Pg. 4 ¶ 10.  Then, Defendant Vickers abruptly and with excessive force "slammed" the handcuffed Thompson against the wall, which caused his "head and chest [to hit] up against the wall and [then Vickers] leaned all his weight to pin [the handcuffed Thompson's] body in that position."  Doc. 29, Pg. 2 ¶ 2.  Before that, Thompson had not made any verbal or threatening moves against anyone. Doc. 29, Pg. 3 ¶ 4.  Nor was he "aggressive in any manner."  Doc. 29, Pg. 3 ¶ 5.  In fact, Thompson was "completely caught off guard by the attack."  Doc. 29, Pg. 3 ¶ 5.

13.     Then, Defendant Ortega abruptly with overwhelming unnecessary force "punched" Thompson in the jaw while he was "handcuffed" and "completely subdued" multiple times and

with "a closed first," and Defendant Vickers verbally taunted Thompson saying: "*You like that? Got your bitch ass punched.*"  Doc. 29, Pg. 2-3 ¶ 2-3, 9.  Defendant Vickers was also holding Thompson "down" at the time.  Doc. 29, Pg. 3 ¶ 7.

14.     On his part, Thompson was "unable to defend or soften the blows" aimed at him. Doc. 29, Pg. 3 ¶ 9.  But Defendant Ortega "punched [Thompson] in the jaw as hard as [he] possibly could."  Doc. 29, Pg. 2 ¶ 2.  All the while, the officers both "maliciously taunted" Thompson "by asking how [he] liked being punched."  Doc. 29, Pg. 4 ¶ 10.

15.     Thereafter, Defendants placed him in a "holding cell" where he remained for "around an hour" without any medical attention.  Doc. 29, Pg. 2 ¶ 2.  It then "took 3 days and asking numerous guards before [Thompson] was sent to the infirmary" to have him evaluated for his serious facial injuries.  Doc. 29, Pg. 2 ¶ 2.  During that time, Defendant Harris County failed to properly observe Thompson and to provide him the medical care he needed for his serious physical injuries. That was also, in part, due to Defendant Harris County's overcrowding and understaffing customs.

16.     On February 1, 2022, Defendant Harris County allowed Thompson to go to the infirmary.  As it turned out, Thompson had "a double jaw fracture that required emergency surgery" since "both sides of [his] jaw were broken."  Doc. 29, Pg. 29 ¶ 13.  He had suffered from "facial swelling, loosened teeth, oral lacerations, and a concussion."  Doc. 29, Pg. 29 ¶ 13.  For which, he required "surgery" and now has to live with "metal pins and plates to fix [his] jaw." Doc. 29, Pg. 4 ¶ 13.  And he has lasting "anxiety" and his "speech" is "slur[ed making it] hard to communicate."  Doc. 29, Pg. 5 ¶ 14.  Moreover, his jaw now is in a constant state of "drooling." Doc. 29, Pg. 5 ¶ 14.  His smile will never again be the same.  All this because, in part, Defendant "Harris County permits its employees to use significant force," and "supervisors approve [the use

of such excessive force] without investigation," and because in this particular case the County and the officers were "deliberately indifferent to [Thompson's] rights."  Doc. 29, Pg. 4 ¶ 12.

## B.    PROCEDURAL HISTORY

17.    The Court allowed Mr. Martinez to file this lawsuit and to prosecute his claims as a *pro se* claimant.  Doc. 1, Doc. 2.  In his Original Complaint, the *pro se* Thompson pled that, as a "pretrial detainee," he was "placed… in handcuffs and punched… in the face repeatedly" and then refused "medical attention for 3 days" after which it was determined that he had a "double jaw fracture."  Doc.1, Pg. 4.  Mr. Thompson further pled that the injuries were so serious that he "underwent a 9-hour surgery that placed a metal" in his face and "permanently scarred and realigned" his smile. *Id*. Moreover, Thompson also pled that "the Harris County Jail" tolerated this because "no reports or statements were written, neither discovery cases / sanctions delivered."  *Id*.

18.    With that, the Court ordered Defendant Harris County to file a <u>*Martinez v. Aaron*</u>, 570 F.2d 317 (10th Cir. 1978) Report (hereinafter a "<u>*Martinez Report*</u>").  Doc. 8.

19.    After which, it was noted that Harris County produced "several video clips of two guards escorting [Thompson] out of the pod, down the hallway, and to a holding cell," but "**none of the clips provided show what happened in the pod from around 11:52:00-11:52:38**."  Doc. 16, Pg 2 #3 (emphasis added).  Given so, the Court further ordered the production of "video surveillance footage" that shows "**the actual confrontation / handcuffing / use of force**."  *Id*. (emphasis added). That's when the Court also ordered Mr. Thompson to file a more definite statement.  Doc. 26.  After which, the *pro se* Thompson did filed a More Definite Statement in which he indicated that he was also filing "an amended complaint, naming the proper defendants." Doc. 29, 30.  Among which was Defendant Harris County.  *Id*.

20.    In his More Definite Statement, Tompson pled the following facts:

8

a.  While Thompson "was asleep on [his] bunk and [Defendant Vickers] woke [him] up and told [him] to get [his] ass in the dayroom," and Thompson did so.  Doc. 29, Pg. 1 ¶ 2.  There, Defendant Ortega "told [him] to get [his] dumb ass in line with the other inmates," and Thompson did so.  Doc. 29, Pg. 2 ¶ 2.  When they both "began to approach" Thompson "aggressively," Thompson "turned around and placed [his] hands behind [his] back" and believed that he was "being handcuffed… for [his] safety."  Doc. 29, Pg. 2 ¶ 2,  Thompson did whatever he could to show them he "was not trying to be combative."  Doc. 29, Pg. 2 ¶ 2.  To be clear, Thompson had no weapons or sharp objects on him.  Doc. 29, Pg. 3 ¶ 5.

b.  Defendants then "escorted" to the "vestibule."  Doc. 29, Pg. 2 ¶ 2.  There, Defendant Vickers abruptly with overwhelming unnecessary force "elbowed [Thompson] in the back of the head."  Doc. 29, Pg. 4 ¶ 10.  Then, Defendant Vickers abruptly with overwhelming unnecessary force "slammed" the handcuffed Thompson's "head and chest up against the wall and leaned all his weight to pin [the handcuffed Thompson's] body in that position."  Doc. 29, Pg. 2 ¶ 2.  Before that, Thompson had not made any verbal or threating moves.  Doc. 29, Pg. 3 ¶ 4.  Nor was Thompson "aggressive in any manner."  Doc. 29, Pg. 3 ¶ 5.  In fact, Thompson was "completely caught off guard by the attack."  Doc. 29, Pg. 3 ¶ 5.

c.  Then, Defendant Ortega abruptly with overwhelming unnecessary force "punched" a "handcuffed" and "completely subdued" [Thompson] "multiple times" in the jaw with a closed first," and Defendant Vickers taunted Thompson with "*You like that? Got your bitch ass punched.*"  Doc. 29, Pg. 2-3 ¶ 2-3, 9.  Defendant Vickers was holding Thompson "down" at the time.  Doc. 29, Pg. 3 ¶ 7. At the time, Thompson was "unable to defend or soften the blows" aimed at him.  Doc. 29, Pg. 3 ¶ 9.  Then, Defendant Ortega "punched [Thompson] in the jaw as hard as [he] possibly could."  Doc. 29, Pg. 2 ¶ 2.  All the while, they both "maliciously taunted" Thompson "by asking how [he] liked being punched."  Doc. 29, Pg. 4 ¶ 10.

d.  Thereafter, Defendants placed him in a "holding cell" where he remained for "around an hour" without medical attention.  Doc. 29, Pg. 2 ¶ 2.  "It" then "took 3 days and asking numerous guards before [Thompson] was sent to the infirmary" for his serious medical needs.  Doc. 29, Pg. 2 ¶ 2.

e.  Defendant "Harris County permits its employees to use significant force," and "supervisors approve [the use of such excessive force] without investigation" and were "deliberately indifferent to [Thompson's] rights."  Doc. 29, Pg. 4 ¶ 12; and

f.  As a result, Thompson had "a double jaw fracture that required emergency surgery" since "both sides of [his] jaw were broken."  Doc. 29, Pg. 29 ¶ 13.  That he suffered from "facial swelling, loosened teeth, oral lacerations, and

9

a concussion." Doc. 29, Pg. 29 ¶ 13. For which, he required "surgery" and now has to live with "metal pins and plates to fix [his] jaw." Doc. 29, Pg. 4 ¶ 13. And he has lasting "anxiety" and his "speech" is "slur[ed making it] hard to communicate." Doc. 29, Pg. 5 ¶ 14. Moreover, his jaw now is in a constant state of "drooling." Doc. 29, Pg. 5 ¶ 14.

21.    In his Amended Complaint, Thompson pled "Harris County" as one of the "Defendants," and stated that its "customs and policies" are ones which "allow excessive use of force" and denials "of medical care" were a moving force behind his injuries. Doc. 30.

22.    As it turns out, Mr. Thompson's claims in this case appear to echo the allegations of another, important pending case, _Wagner v. Harris County, Tex._, No. 4:23-CV-02886 (S.D. Tex. 2023), which was likewise filed against Defendant Harris County, and which is currently pending before Judge Ellison. In that case, several plaintiffs have brought extremely similar claims of jail abuse and medical care denial in jail, against Defendant Harris County.

23.    Mr. Thompson reached out to the undersigned counsel, and retained us, in hopes that his case may be able to proceed in parallel or consolidated fashion with said case, where at least 27 other jailed individuals suffered serious injuries or death. Hence, Thompson's newly proposed Second Amended Complaint mirrors the allegations made in the referenced case, as it appears to be closely related to the serious jail abuse and jail neglect issues raised in said case. Mr. Thompson, as a Harris County Jail inmate, seems to be a victim of the same abuse and medical neglect that has sadly become increasingly more commonplace in that jail in the last 2-3 years.

24.    Indeed, the undersigned inform the Court that in said reference case, we represent a plaintiff-intervenor named Ana Garcia, and, in said case, her Fed. R. Civ. P. 24(b)(1) Motion to Intervene was recently granted by the Court, due to factual commonalities _See Wagner v. Harris Cnty._, 2024 U.S. Dist. LEXIS 68793 (S.D. Tex. 2024) (Ellison, K.) (hereinafter referred to as "_Wagner I_").

10

25. Soon after issuing his ruling granting intervention, *Wagner I*, the Honorable Keith Elision also issued another opinion, *Wagner v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 98779 (S.D. Tex. 2024) (Ellison, K.) (hereinafter referred to as *Wagner II*), in which he found that the original twenty-seven (27) plaintiffs therein had sufficiently common claims concerning conditions of confinement and *Monell* issues against the same Defendant, Harris County.

26. Now Plaintiff pleads facts similar to the *Wagner* case, referenced above, given the strong similarities to both.

## VI.   CAUSES OF ACTION

### COUNT 1 – UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT
*(Against Defendant Harris County)*

27. Thompson fully incorporates the foregoing and succeeding paragraphs as if set forth herein.

28. To state a conditions-of-confinement claim, a plaintiff need only point to a rule or restriction in place at the jail, or otherwise demonstrate the existence of an identifiable intended condition or practice. *Wagner II*, 25. A condition of confinement can be "an unstated *de facto* policy, as evidenced by a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical  of extended or pervasive misconduct by jail officials, to prove an intended condition or practice. *Id*. (quoting *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009)). Conditions of confinement claims are adjudicated under the standard articulated in *Bell v. Wolfish*, 441 U.S. 520 (1979), which allows courts to "assume, by the municipality's promulgation and maintenance of the complained of condition, that it intended to cause the alleged constitutional deprivation." *Wagner II*, *27.  Because a state may not punish a pretrial detainee, conditions of confinement for such an inmate that amount to punishment violate the Constitution.  *Wagner II*, *30 (citing *Duvall v. Dallas County Tex.*, 631 F.3d 203, 206 (5th Cir. 2011)).  Hence, the relevant

test is whether the condition that is alleged to be the cause of the constitutional violation has a reasonable relationship to a legitimate governmental interest. *Id*. In other words, a plaintiff, like Thompson, is not required to show deliberate indifference. *Id*., 27 & 30. Rather, a plaintiff need only show: (a) a rule or restriction (b) that had no reasonable relationship to a legitimate government interest. Here, at the very least, the rules or restrictions in place included as follows: (1) the institutionalization of excessive force by officers against pre-trial detainees, (2) denial of adequate medical care, (3) failure to properly observe and monitor detainees, and (4) overcrowding and understaffing. *Compare supra to* Wagner II, *4. In this case, as these elements are present and bore no reasonable relationship to a legitimate interest of the County, they violated the constitution and Plaintiff's constitutional rights. *Id*.

29.　　To support that principle espoused in *Wagner II*, Thompson comes to this Court and has extensive evidence suggesting the relevant conduct is ubiquitous in the Jail, including a series of Texas Commission on Jail Standards ("TCJS") reports which confirm that year-after-year the County Jail has not been, and to this date is not yet, compliant with minimum jail standards. Moreover, since 2009, there was a report from the DOJ analyzing the conditions at the Jail, and containing statements from Defendant Harris County's Sheriff and former Jail employees that admitted to serious issues in the Jail, plus included dozens of descriptions of incidents similar to those experienced by Thompson in this case. *Compare Id*., *27-28 *to Infra*. These allegations go beyond mere isolated incidents of misconduct perpetrated by individual officers, and instead suggest a set of *de facto* policies in place at the Jail. *Id*. In sum, the Jail's deficiencies relate to excessive force, monitoring detainees, providing medical care, and allowing overcrowding and understanding are sufficiently extended or pervasive to show an intended condition or practice that harmed Thompson. *Id*.

30.     Out of abundance of caution, and for purposes of brevity, the Plaintiff hereby adopts by reference the facts and statements contained in the pleadings of the *Wagner v. Harris Cnty*. case, mentioned above. Fed. R. Civ. P. 10(c). Alternatively, Plaintiff respectfully requests the Court to take judicial notice of said pleadings in said case.

**COUNT 2 – *MONELL* PATTERN-OR-PRACTICE**
*(Against Defendant Harris County)*

31.     A county may be directly liable under *Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978).  The elements for such a § 1983 municipal liability claim include the following: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom). *Notzon v. City of Laredo*, 2018 U.S. Dist. LEXIS 117804 (S.D. Tex. 2018) (Hanen, A.) (finding Plaintiffs had sufficiently alleged the purported misconduct of officers was the result of "a longstanding Laredo Police Department custom, or practice of covering up illegal police conduct, with deliberate indifference towards Plaintiffs' rights"); *Garza v. Guerra*, 2009 U.S. Dist. LEXIS 3304 *23 (S.D. Tex. 2009) (Hanen, A.) (finding § 1983 *Monell* claim survived dismissal).[1]

**A.      THE POLICY OR CUSTOM**

32.     As a general matter, there are at least three ways to establish an official policy under *Monell*: (1) written policy statements, ordinances, or regulations, (2) a widespread practice that is so common and well-settled as to constitute a custom that fairly represents policy, or (3) even a single decision may constitute municipal policy where the official or entity possessing final policymaking authority for an action performed the specific act that forms the basis of the § 1983

---

[1] *See also Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509 (5th Cir. 2022); *Bishop v. Arcuri*, 674 F.3d 456, 467 (5th Cir. 2012); *see also Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *7-8 (S.D. Tex. 2018); *Releford v. City of Houston*, 2016 U.S. Dist. LEXIS 167749 *9 (S.D. Tex. 2016) (Ellison, K.).

claim.  *St. Maron Props., L.L.C. v. City of Houston*, 2023 U.S. App. LEXIS 22044 *7 (5th Cir. 2023); *see also Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *8 (S.D. Tex. 2018) (noting the first two).  Here, upon information and belief, the County jail administration has written policy statements, common and well-settled widespread practices, and/or single decisions by policymakers within the administration that results in constitutional rights violations which included, at the very least, the following:  (1) the institutionalization of excessive force by officers against pre-trial detainees, (2) denial of adequate medical care, (3) failure to properly observe and monitor detainees, and (4) overcrowding and understaffing.  *Wagner II*, *4

### i.    INSTITUTIONALIZATION OF EXCESSIVE FORCE

33.    Defendant Harris County has a policy or custom of permitting officers at the Jail to use excessive force against detainees.  *Wagner II*, *36-37.  Like in *Wagner II*, Thompson below will allege numerous incidents of officers using excess force unprovoked, in retaliation for detainees reporting other issues in the Jail, or in response to perceived slights.  *Id.*  Not only do the plaintiffs in *Wagner II* make those claims, but also Thompson here identifies in this amended complaint several others who have been subject to similar incidents of officer violence in the Jail. *Compare Id to Infra*.  These excessive force incidents involves various permutations of a set of similar themes.  *Id.*  Some common elements include taking detainees to isolated area without cameras, slamming detainees to isolated areas without cameras, slamming detainees against walls, restraining detainees with handcuffs, using close fist strikes and kicks, and failing to properly document the force used.  The excessive force incidents are also similar severity, as most of the incidents alleged involved a combination of broken bones and substantial head injuries, resulting in lasting injury or death.  *Id.*

14

34. These accounts are in accord with the findings of a DOJ Report, listed in detail below, which concluded that the Jail's systematic deficiencies exposed detainees to harm or risk of harm from excessive use of force. *Id.* The DOJ's investigation found significant number of incidents where staff used inappropriate force techniques, often without subsequent documented investigation or correction by supervisors, causing serious concerns about the use of force at the Jail. *Id.* The DOJ report also noted that the Jail lacked minimally adequate system for deterring excessive use of force. *Id.* The ongoing, and possibly worsening, nature of the problem is born out of certain statistics as well. *Id.* The Jail has been home to an increasing proportion of the use of force incidents resulting in bodily injury across Texas. *Id.* In 2022, Defendant Harris County's Jail had more incidents where officers' use of force against detainees caused bodily harm than every other county jail in Texas combined. *Id.* Moreover, the Jail was on track to again eclipse use of force in other counties in 2023. *Id.* In combination with numerous other similar incidents pled below of excessive force, this documentation suggests an ongoing municipal custom of allowing Jail officers to excessive force against detainees with impunity. *Id.*

### ii.   THE DENIAL OF ADEQUATE MEDICAL CARE

35. Defendant Harris County has a policy or custom of failing to provide medical care to detainees. *Wagner II*, *34-35. Like in *Wagner II*, when Defendant Harris County does provide medical care, the care rendered is often untimely or severely inadequate. *Id.* Below, Thompson pleads numerous similar incidents where detainees were denied medical care, and instances where detainees did not receive adequate evaluation, testing, monitoring and treatment after being beaten by officers. *Id.* The *Wagner II* plaintiffs are not the only detainees to endure this as Thompson has also pled that other specific pretrial detainees have been denied medical care as well. *Id.* This

denial of care has had uniformly disastrous outcomes for detainees, often resulting in prolong injuries, new chronic conditions, or death. *Id*. It also aggravated Thompson's injuries.

36.    In addition, below, Thompson pleads several TCJS reports from the past decade in which the Jail was found to have improperly denied medical care after it was requested or where an individual died or was seriously injured because the Jail withheld medical care. *Id*. Those reports include ones from December 9, 2020, December 19, 2022, and March 8, 2023, among others. *Id*. Their findings are in accord with the findings from the 2009 DOJ report assessing conditions at the Jail, which found the medical care to be severely lacking. The report went on to also find that the inadequate medical care was serious enough to place detainees at an unacceptable risk of death or injury. *Id.* Combined these allegations suggest a sustained pattern of substandard medical care that is sufficiently pervasive to constitute a municipal policy. *Id*.

### iii.    FAILURE TO PROPERLY OBSERVE, MONITOR DETAINEES

37.    Defendant Harris County has a policy or custom of failing to properly observe and monitor detainees through face-to-face checks and video monitoring of known blind spots that scenes of repeated violence. *Wagner II*, *39-41. Moreover, employees inaccurately report and document their observations. *Id*. Like in *Wagner II*, the Jail's scant monitoring practices have been documented extensively in a serious of TCJS reports. *Id*. Several reports describe these failures. *Id*. Other TCJS reports note that the Jail has "on a routine basis" failed to adequately monitor detainees in the 30-minute or 60-minute intervals that minimum jail standards require. *Id*. These reports include those from December 9, 2020, April 6, 2021, December 7, 2021, March 8, 2023, April 17, 2023, and August 28, 2023. *Id.* The TCJS has also noted that officers had been falsely documenting that they had completed observations that they had not actually conduced. *Id*. This policy of inadequate monitoring is further reflected in the pattern of incidents pled by

Thompson below.  *Id*.  Despite the repeated notices of non-compliance, and myriads of similar incidents arising from this insufficient monitoring custom, the Jail has failed to alter its inadequate monitoring practices.  *Id*.  This dereliction suffices to suggest the existence of a municipal policy of inadequate observation of detainees.  *Id*.  Had Thompson been properly monitored, he would neither have been beaten or allowed to sit in his cell with jaw fractured for days.

### iv.      OVERCROWDING AND UNDERSTAFFING

38.      Defendant Harris County has a policy or custom of systematic understaffing and overcrowding relative to the number of detainees.  *Wagner II*, *40-46.  Like in *Wagner II*, this understaffing and overcrowding facilities excessive force by officers, impedes access to medical care, and inhibits adequate monitoring of detainees.  *Id.*  The systemic understaffing and overcrowding is, again, discussed in below pled TCJS reports.  *Id*.  As they report, the Jail has repeatedly failed to employ sufficient staff to meet minimum standards.  *Id*.  Those reports specifically include those from December 7, 2021, March 8, 2023, and August 28, 2023.  *Id*.  The failure to comply minimum ratio of officers to detainees for years was also discussed at TCJS board meetings on August 3, 2023 and November 2, 2023.  *Id*.  The reports go on to describe the connection between the Jail's understaffing and other pervasive issues in the jail.  *Id*.  Among which is the fact that minimal staffing has had a direct impact on the ability to prove a safe and secure environment  for inmates and jail staff in area such as enforcing inmate rules, ensuring inmates clean housing areas, provide for possible contributed to an increase in inmate-on-inmate assaults and inmate on staff assaults.  *Id*.  Those involved in the operations of the Jail have also likewise noted the staffing issues, and have spoken publicly and on the record about it.  *Id*.   In fact, at the November 2, 2023, even Defendant Harris County's Sherriff confessed publicly that his Jail was not in compliance with TCJS minimum standards.  *Id*.

17

**B.    THE POLICYMAKERS KNEW OR SHOULD HAVE KNOWN**

39.    Under *Monell*'s second element, Plaintiff need only show that a policymaker actually or constructively knew of the custom. *Moore v. LaSalle Management*, No. 20-30739 (5th Cir. July 22, 2022) at Pg. 23 ¶ 1.  A policymaker is an individual or individuals who takes the place of the governing body in a designated area of government administration.  *Zarnow v. City of Wichita Falls Tex.*, 614 F.3d (5th Cir. 2010).  Here, that would be either the Defendant's Sherriff or its Commissioner's Court.  Upon the former, the Harris County Sheriff is the policymaker for the Defendant with regards to both the Harris County Jail and the employees of the Sheriff's Office.  *Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *9 (S.D. Tex. 2018).  As background, in Texas, sheriffs "have indisputable wide-ranging discretion in the selection of their employees." *Garcia v. Reeves County*, 32 F.3d 200, 203 (5th Cir. 1994).  Among which, a sheriff may, with the approval of the Commissioners Court employ a sufficient number of guards to ensure the security of a jail.  *See* Tex. Gov't Code § 85.005.  Moreover, deputies serve at the pleasure of the sheriff.  *See* Tex. Gov't Code § 85.003(c).  Thus, either or both the Sheriff and/or the Commissioner's Court are the relevant policymakers for the purposes of *Monell*'s second element.  And, here, through various laws, reports, notices of non-compliance, public debates, incidents, lawsuits, settlements, new stories, and internal documentation, the County's Sheriff and Commissioner's Court knew of the pattern-or-practice at issue in this lawsuit.

40.    Out of abundance of caution, and for purposes of brevity, the Plaintiff hereby adopts by reference the facts and statements contained in the pleadings of the *Wagner v. Harris Cnty.* case, mentioned above. Fed. R. Civ. P. 10(c). Alternatively, Plaintiff respectfully requests the Court to take judicial notice of said pleadings in said case.

**i.    THE TEXAS ADMINISTRATIVE CODE**

18

### a.    SUPERVISION REQUIREMENTS

41.    The first source of notice is Texas law.   It first put Defendant's policymaker was on notice of certain supervision requirements.  Among those, first, every jail facility is required to have an appropriate number of jailers at the facility twenty-four (24) hours each day, and shall have an established procedure for documented, face-to-face observation of all inmates by jailers no less than once every sixty (60) minutes.  *See* Tex. Admin. Code § 275.1.  For inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior, observation is to be performed at least every thirty (30) minutes.  *Id*.  Moreover, Defendant was required to have two-way voice communication capability between inmates and jailers, and closed-circuit television may be used, *but not in lieu of the required personal observation*.  *Id*.

42.    Additionally, Defendant was required to have the inmates be supervised by an adequate number of jailers.  *See* Tex. Admin. Code § 275.4.  One jailer was required to be on each floor of the facility where ten (10) or more inmates were housed, with no less than one (1) jailer per forty-eight (48) inmates or in an increment thereof on each floor for direct inmate supervision. *Id*.  And, for the protection of the inmates, any items brought into the security perimeter, were required to be searched for contraband, and there should be regular and irregular searches of the entire facility for contraband noted in the permanent facility record.  *See* Tex. Admin. Code § 275.4.  Here, upon information, and belief, Defendant Harris County violated all of these with deliberate indifference as it related to Thompson's incidents.

### b.    PROVISION OF HEALTHCARE REQUIREMENTS

43.    The Texas Administrative Code also put Defendant Harris County's policy maker on certain requirements related to the provision of healthcare.  Among the mandatory requirements for the treatment of inmates, state law mandates that Defendant's policymaker have a health

services plan which provides for medical services by licensed physicians, professionals, allied health personnel,[2] hospital, or similar services. *See* Tex. Admin. Code § 273.1. Said plan must specifically comply with the following, in relevant part:

(1) provide for regularly scheduled sick calls,

(2) provide referrals for medical services,

(3) provide for procedures for efficient and prompt care for acute and emergency situations…

(4) …

(5) …

(6) …

(7) provide for procedures for the distribution of prescriptions,

(8) provide procedures for the control and distribution of over-the-counter medications…

(9) …

(10) provide procedures for all examinations, treatments, and other procedures to be performed in a reasonable and dignified manner and place,

(11) provide that adequate first aid equipment and patient evacuation equipment be on hand at all times,

(12) provide procedures that shall require that a qualified medical professional review prescription medication an inmate is taking when taken into custody…

(13) …

(14) provide procedures to give inmates the ability to access a health professional at the jail or through telehealth service 24 hours a day or, if a health professional is unavailable at the jail or through telehealth service, provide for a prisoner to be transported to access of a health professional.

---

[2] Allied Health Personnel are licensed health professionals that are involved with the delivery of health-related services pertaining to the identification, evaluation, and prevention of diseases and disorders, dietary and nutrition services, and rehabilitation and health systems management. *See* Tex. Admin Code § 253.1(2).

20

*See* Tex. Admin. Code § 273.1(1-3), (7-8), (10-12) and (14).

44.     Moreover, Texas law has also put Defendant's policymakers on notice that all medical instructions of designated physician were to be followed.  *See* Tex. Admin. Code § 273.3. Here, upon information, and belief, Defendant Harris County violated all of these with deliberate indifference as it related to Thompson's incidents

### ii.      THE DEPARTMENT OF JUSTICE REPORT

45.     In addition to the Texas Administrative Code, the U.S. Department of Justice also put Defendant's policymakers on notice.  As background, the deplorable conditions and nature of Defendant's jail grew to such a degree that the U.S. Department of Justice (hereinafter referred to as the "DOJ") was forced to investigate the Defendant for constitutional violations beginning back in March 2008.  *See* Doc. 1, Pg. 51 ¶ 274.  After which, on June 4, 2009, the DOJ concluded:

 "[C]ertain conditions at the Jail violate the constitutional rights of detainees. Indeed, the number of inmate deaths related to inadequate medical care, described below, is alarming. As detailed below, we find that the Jail fails to provide detainees with adequate: (1) medical care; (2) mental health care; (3) protection from serious physical harm; and (4) protection from life safety hazards."

In regard to medical care, the DOJ found significant deficiencies in multiple areas and explicitly put Defendant on notice of the following:

"[T]he Jail fails to provide consistent and adequate care for detainees with… medical conditions.  These deficiencies, in themselves and when combined with the problems in medical record-keeping and quality assurance discussed below, **are serious enough to place detainees at an unacceptable risk of death or injury**."

Specifically, "Because of **crowding**, administrative weakness, and resources limits, the Jail does not provide constitutionally adequate [medical] care to meet the serious [medical] needs of detainees."  Moreover, the DOJ also put the Defendant Harris County on notice that physicians and nurses routinely filled-out paperwork incorrectly stating that evaluations were done when they were in fact not even completed.  Moreover, the DOJ also put Defendant Harris County on notice

21

that there were problems with "care assessments" and "in the assessment of detainees receiving medications." That medications were not properly monitored, were not routinely given out, dosages were provided in varying levels with potentially fatal combinations, and the effects of the medication were not followed-up with. *Id.*

46. Additionally, the DOJ also put Defendant on notice that the Defendant's clinic was but a "makeshift emergency room" insufficient to meet the needs of thousands of detainees within the jail. That the process for requesting care was insufficient "due to **crowding**, staffing limits, and some problematics practices." And, that some of these practices included having inadequate oversight for detainee requests for medical care *and significant delays in responding to medical requests*. That the Defendant had a trend of deleting medical requests after being processed so no confirmation or follow-up to confirm that the medical issue had been resolved. *Id.* Put simply, Defendant Harris County was put on notice that its detainees had "a difficult time first **accessing** the clinic, and then receiving continuity of care." Moreover, the DOJ also put the Defendant Harris County on notice of multiple incidents within the jail that were similar to the Decedent and Plaintiff's claims for lack of medical care.

47. Moreover, the DOJ also put Defendant on notice that its jail had significant issues with record keeping with notes being illegible and containing "factually inaccurate documentation." And that detainees with serious medical conditions "cannot obtain timely and appropriate care," and that such "deficiencies violate generally accepted correctional" health standards. Moreover, the DOJ put Defendant on notice of many detainees who were evaluated by the clinic and were sent back to their cell with little to no medication or evaluation where the detainees in question shortly thereafter died. Additionally, the DOJ put the Defendant notice that its Jail "lacks adequate video surveillance and supervision in various holding areas," and that

people could die as a result of those failures. And, that this made it "difficult to supervise." Furthermore, the DOJ put the Defendant on notice of the impact of overcrowding on its jail. That "[j]ail crowding affects multiple [j]ail systems," among which includes the fact that it "impedes detainee access to medical care, indirectly affects detainee hygiene, and reduces the staff's ability to supervise the detainees in a safe manner." And that many of the areas of the jail lacked video surveillance. Upon information and belief, none the things above reported on in the June 2009 DOJ Report were never corrected, and consequently, the Thompson and the other pre-trial detainees pled in the lawsuit were injured as a result.

### iii.   TEXAS COMMISSION ON JAIL STANDARDS REPORTS

48.   The Texas Commission on Jail Standards also put Defendant's policymakers on notice. As background, in 1975, the Texas Legislature created the Commission on Jail Standards (hereinafter referred to as the "TCJS") to implement a state policy that all county jail facilities conform to minimum standards of constructions, maintenance, and operation. *See* Tex. Admin. Code § 251.1. In 1991, the Texas Legislature added the requirement for count, payment, and transfer of inmates when precipitated by crowded conditions. *Id.* The duty of the TCJS is to promulgate reasonable written rules and procedures establishing minimum standards, inspection procedures, enforcement policies and technical assistance for the maintenance and operation of jail facilities as well as for the custody, care and treatment of inmates. *Id.* (1-2). And, from time-to-time, the TCJS has issued reports that have put Defendant's policymakers on notice.

49.   First, on March 11, 2016, the Texas Commission on Jail Standards (hereinafter the "TCJS") issued a report that further put the Defendant Harris County on notice. As background, the TCJS is responsible for inspecting county jails to determine if they meet minimum standards, and may from time to time, conduct reviews of in-custody deaths. In that report, the TCJS issued

23

a notice of non-compliance when the Defendant failed to provide medical services to a detainee making five (5) different medical requests. These requests spanned over the course of an entire month, and yet the detainee was not provided with any medical services within the minimum thirty (30) day requirement. In relevant part, the TCJS put Defendant on notice of the following:

> "Documentation received and reviewed by the Commission revealed that Harris County did not provide MHMR services within thirty days after the requests had been submitted by the inmate. The inmate in question requested MHMR services on 10/30/2015, 11/02/2015, 11/08/2015, 11/10/2015 and 11/23/2015. The inmate in question had the paperwork triaged on each occasion and the inmate was deemed a level 3. Per Harris Co. policies and procedures, level 3 type inmates are to be seen by the clinician within 30 days of the triage which failed to occur."

That report also shows an official record that Defendant Harris County's policymakers were aware of the lack of rapid and sufficient medical care to detainees. This is almost identical to the DOJ Report which found a similar incident of a detainee not receiving medical care despite four (4) different requests. This report is also consistent with several incidents at or around this time of detainees failing to receive any medical care.

50. Second, on February 21, 2017, the TCJS issued yet another notice of non-compliance in a special inspection report while inspecting the in-custody death of detainee Vincent Young. In this report, TCJS noted that the jail was required to conduct face-to-face observations with detainees. But Defendant Harris County failed to properly do so, and Young died as a result. Hence, this report is evidence that Defendant Harris County knew that the jail suffered from a failure to properly observe and monitor their detainees, to prevent them from inuring themselves and to provide timely medical care. These same policies and customs identified in this report were also moving forces behind the constitutional violations suffered by Thompson.

51. Third, on April 3, 2017, the TCJS issued another notice of non-compliance to the jail based on a special inspection report when two (2) detainees were left in a transport van at the

24

jail for ten (10) hours. The TCJS found that the jail had failed to properly observe and monitor the two (2) detainees because they were left in an unsupervised van, and that Defendant Harris County had not conducted face-to-face observations as they were required to do so. The only way Defendant Harris County had become aware of the detainees being left in the vehicle was a report from a member of the public who passed the vehicle and heard banging on the walls. Hence, this report evidences that Defendant Harris County's policymakers knew that the jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. These same policies and customs identified in this report were also moving forces behind the constitutional violations suffered by Thompson.

52.    Fourth, on December 19, 2017, the TCJS conducted a special investigation of the Defendant following the in-custody death of Maytham Alsaedy. As explained elsewhere in this complaint, Alsaedy had a history of serious medical conditions which went untreated while he was in the Defendant Harris County's custody, and despite knowing about it, Defendant Harris County fostered the conditions-of-confinement that led to his death. Consequently, the TCJS found that the jail was non-compliant with minimum standards because they failed to conduct proper and timely face-to-face observations of Alsaedy. Further, Defendant Harris County permitted Alsaedy to cover his window with paper, so even though a jailer did pass by Alsady's cell, the jailer did not properly observe him or make him remove the paper. This non-compliance was a moving force behind Alsaedy's injuries, and the DOJ warned about these same dangers in the wrote detailed above. That said, the TCJS report stated:

> "After reviewing documentation and video evidence in conjunction with self-reporting of the facility administration, it was determined that the 30-minute face-to-face observation, prior to the inmate being discovered, did not occur due to the inmate obstructing the view of the jailer by placing paper in the view panel. While the jailer made a round within the required time period, the jailer did not view the inmate face-to-face as required by minimum jail standards."

25

Hence, this report too evidences that Defendant Harris County's policymakers knew that the jail suffered from a failure to properly observe and monitor their detainees and to provide timely medical care. These same policies and customs identified in this report were also moving forces behind the constitutional violations suffered by Thompson.

53. Fifth, on August 23, 2018, the Texas Commission on Jail Standards via a Special Inspection Report put Defendant Harris County again on notice of the constitutionally deficient conditions of its confinement. This time in relation to the in-custody death of Debora Ann Lyons. Again, as background, every jail facility needs to have an appropriate number of jailers at the facility for twenty (24) hours each day, and each facility needs to have an established procedure for documented, face-to-face observation by jailers for no less than once every sixty (60) minutes. And, observations should be performed at least every thirty (30) minutes, but the special report indicated that the Defendant Harris County had failed to do so. Here, Lyons was able to sneak into an empty meeting room for hours where she would later come to have medical needs that were not met, and later other detainees found her unresponsive. By failing to properly observe and monitor Lyons, Defendant Harris County failed to prevent her from dying and failed to timely provide her with adequate and sufficient medical care. In relevant part, the TCJS found Defendant Harris County to be non-compliant and stated the following:

> "After reviewing documentation and video evidence in conjunction with self-reporting by facility administration, it was determined that the inmate was not observed every 30 minutes prior to being discovered. While the jail made a round within the required period in the inmates' cellblock, the jailer did not view the inmate face-to-face due to the inmate leaving the cellblock for medicine call and never returning."

Hence, this report also evidences that Defendant Harris County's policymakers knew that the County jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. These same policies and

customs identified in this report were also moving forces behind the constitutional violations suffered by Thompson.

54.    Sixth, on December 4, 2020, the Texas Commission on Jail Standards again put Defendant Harris County on notice that each of its facilities needed to have the appropriate number of jailers at the facility twenty-four (24) hours each day, and need to have an established procedure for documented face-to-face observation of all inmates by jailers no less than once every sixty (60) minutes, and that observations needed to be performed at least every thirty (30) minutes but that Defendant Harris County had failed to do so.  This time it did so via its annual inspection of the Harris County Jail, and found the jail non-complaint in multiple areas.  Firstly, the TCJS noted that "it was determined that staff [were] routinely not completing the initial classification assessment and re-assessments properly."   Secondly, the TCJS noted that the jail staff was not filling out the detainee medication files correctly with many detainees' records being left blank. To be fair, the records did not show if the medications were issued or if they were refused.  Either way, the reality is Defendant Harris County continues to employ a pattern, practice, and policy of recklessly disregarding inmates' rights in this area because currently far too many detainees do not receive their medication and their files are either blank or filled-out incorrectly.  Thirdly, the TCJS found that the jail staff were not filling-out medical health screening forces correctly resulting in many detainees not being classified within the proper health category.  Fourthly, the TCJS found significant failures by Defendant Harris County in the area of supervision when it came to conducting face-to-face observations of inmates ranging from 3 minutes to 464 minutes.   Hence, this report also evidences that Defendant Harris County's policymakers knew that the jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.  It also provides evidence that Defendant

27

Harris County has ongoing issues with properly documenting and providing health care to their detainees. These same policies and customs identified in this report were also moving forces behind the constitutional violations suffered by Thompson.

55.    Seventh, on April 6, 2021, the TCJS issued another notice of noncompliance to Defendant Harris County that put its relevant policymakers on notice.  This time it related to the in-custody Jaquaree Simmons' death.  Simmons had been beaten by multiple detained officers, and then left inside of his cell alone without observation or medical care.  The TCJS found that Defendant Harris County was still non-compliant with the minimum observation requirements as identified in the December 8, 2020 report.  To be exact, observation of the inmates by jail staff in the relevant area was not documented for over four (4) hours.  Additionally, although video surveillance was submitted and reviewed, the TCJS was unable to clearly identify when observation rounds were conducted by jail staff.  *Id*.  Hence, Defendant Harris County had not observed any of the detainees within the pod that also contained Simmons.  Defendant Harris County was suffering from his injuries during this time and needed continuous medical treatment but it was not provided.  By failing to provide proper face-to-face observation and monitoring of Simmons and other detainees, Defendant Harris County failed to provide sufficient and timely medical care which were moving forces behind his injuries and death.  Hence, this report too evidences that Defendant Harris County's policymakers knew that the jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.  These policies and customs identified in this report were moving forces behind the constitutional violations suffered by Thompson.

56.    Eighth, on November 15, 2021, the TCJS yet again put the Defendant Harris County notice that a review of documentation revealed that some face-to-face inmate observations

28

were not performed by jailers once every sixty (60) minutes as required, and that anywhere between ninety (90) and one-hundred and forty-four (144) minutes passed between round conducted. Moreover, it was also found that the proper ratio of guards to inmates had not always been maintained as required. Hence, this report too evidences that Defendant Harris County's policymakers knew that the jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. These same policies and customs identified in this report were also moving forces behind the constitutional violations suffered by Thompson.

57. Nineth, on December 7, 2021, the TCJS issued its annual inspection report, and it found Defendant Harris County to be in continuous non-compliance in multiple areas. Namely, the TCJS found that Defendant Harris County had not conducted face-to-face observations in a timely and sufficient manner with as many as ninety (90) to one-hundred and forty-four (144) minutes between rounds. Moreover, the TCJS also found that compounding issues in Defendant Harris County's use of supervisors and essential personnel including intake personnel to work housing to meet their 1:48 ratio requirements. This report is additional evidence that despite being made aware of the issues through numerous non-compliance notices, Defendant Harris County and its policymakers continued to know that the jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. It also provided evidence that Defendant Harris County has ongoing issues with properly documenting and providing observations of the detainees. Further, this report exemplified the staffing and overcrowding issues which were part of Defendant Harris County's ongoing policy which inhibits proper medical care, proper supervision, and proper deterrence of violence both amongst the detainees and by officers on detainees. These same policies and

29

customs identified in this report were also moving forces behind the constitutional violations suffered by Thompson.

### iv.     LAWSUITS AND SETTLEMENTS

58.     Defendant Harris County and its policymakers also had notice via similar lawsuits and settlements filed in courts prior Thompson's incident.  First, on June 2, 2015, the Defendant Harris County settled Terry Goodwin's deliberate indifference claims for $400,000.00.  Terry Goodwin's incident is described elsewhere in this petition.  Second, on December 30, 2018, Vincent Young filed a lawsuit against Defendant Harris County which also put Defendant Harris County and its policymakers on notice.  Young's incident is described elsewhere in this petition. Third, on August 21, 2018, Defendant Harris County settled Christopher Johnson's deliberate indifference claims.  Johnon's incident is described elsewhere in this petition.  Fourth, on August 24, 2018, Defendant Harris County settled Michael Alaniz's deliberate indifference claims. Alaniz's incident is described elsewhere in this petition.  Fifth, on January 29, 2019, Defendant Harris County settled Lucas's deliberate indifference claims as well.  Lucas's incident is described elsewhere in this petition.  Sixth, on September 10, 2020, Defendant Harris County was hit with a deliberate indifference lawsuit from a Natividad Flores.  Flores' incident is described elsewhere in this petition, and Defendant later settled with Flores.  Seventh, on September 10, 2021, Defendant Harris County was also hit with a deliberate indifference lawsuit from a Tron Madise.  Madise's incident is described elsewhere in this petition.  Eight, on October 28, 2021, Defendant Harris County settled with a Jerome Bartee who too filed a deliberate indifference lawsuit.  This case resulted in the following a written opinion, _Bartee v. Harris Cty._, 2018 U.S. Dist. LEXIS 232945 *2 (S.D. Tex. 2018), which too put the Defendant Harris County on notice.  Bartee's incident is

described elsewhere in this petition as well.  Hence, all of these lawsuits, settlements, and written judicial opinions put Defendant and its policymakers on notice before Thompson's incident.

### v. PUBLIC STATEMENTS OF THE POLICYMAKERS

59.     Public statements by Defendant Harris County's own policymakers also shows that Defendant Harris County has actual knowledge and notice of the problems in the jail resulting in violations of inmates' civil rights.  To start, on September 7, 2016, Defendant Harris County's Sheriff (*i.e*., one of its policymakers) held a press conference and confessed publicly that Defendant Hassi County has had "failed leadership" that "has left the jail woefully understaffed by a young workforce." *Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *3, *11-12 (S.D. Tex. 2018).  Next, on October 26, 2016, Defendant Harris County's then County Sheriff incumbent Ron Hickman, and his then-challenger Ed Gonzalez (and eventual election-winner) engaged in a public debate.  *Id*., Pg. 56 ¶ 300. During it, both policymakers acknowledged the rampant issues within the jail and said that things needed to change.  *Id*.

60.     The second question in the debate was directed at Defendant Harris County's current policymaker Sheriff Gonzalez, and it went: "*Mr. Gonzalez, a concerning number of people have died in the Harris County Jail, that's a number that has, that's not new, it's going on for some time, how can those kinds of deaths be prevented?*"  His response revealed his own, personal knowledge concerning the ongoing civil rights violations against detainees which were also referenced in the DOJ report, and which continue to occur presently— he said:

> "Well, I think we need to change the culture…. We need to… leverage[e] technology, there's technology available that could help reduce [deaths] … uh … for example by measuring when there's a decreased pulse inside the jail cell.  We need to be pursuing that. We also need to make sure that we're better training our deputies and detention officers as well as the triage when they first come in… employees are being forced to work mandatory overtime, they're overworked, moral is poor, bad decisions happen when that's occurring so we need to make sure that we change.  And we also need to improve training as well… it starts with leadership.  We've got to end this culture."

Moreover, during the debate Mr. Gonzalez also referenced a 2015 incident where the TCJS had found the County to be non-compliant for refusing to provide medical treatment to a patient on four (4) different occasions. And Mr. Gonzalez further stated that this "is nothing new," and that it was "a culture" where "something should have been done" because that could "be your daughter, your granddaughter [or] could have been one of our loved ones."

61. Thereafter, continuing with debate questions, the moderators put Gonzalez on notice of the "overcrowding problem" to which he responded that he was going "to make sure that we lower our jail overpopulation."[3] And in his response, he added that if changes were not made, we would "continue to see a lot of the same problems."

62. Next, Defendant Harris County's Sheriff Gonzalez also recognized the staffing issues within the jail by pointing out the requirements for staff to work overtime and criticized his predecessor, Mr. Hickman, by stating that there were too many people in the laundry, kitchen and other areas when they should be focusing on the positions that must meet the 1:48 ratio.[4] And, in his closing argument during said debate, Defendant's Sherrif Gonzalez reiterated that he personally had the skills to "clean up our county jail" because "too many inmates [were] losing their lives or are less safe." Said debate, held on October 26, 2016, exemplifies how long the County leadership and policymakers have had knowledge of the civil rights violations, and the injuries and deaths resulting thereof, because clearly it has been at the center of public discussion, with a high degree

---

[3] When looking at jail population statistics, the Defendant's jail population is much higher now, and is much higher than it was during the tenure of Defendant Sheriff Gonzalez's predecessor, Mr. Hickman.

[4] This practice of pulling unqualified staff from other positions to meet the 1:48 ratio is the exact sort of policy that the TCJS found Defendant to be non-complaint of in its November 2021 Report and Notice of Noncompliance.

of publicity. Therefore, it cannot be denied that Defendant Harris County has long had notice of the unconstitutional policies and customs identified in this complaint which are the moving forces behind the constitutional violations suffered by Thompson.

63.     As has been demonstrated, Defendant Harris County's own Sheriff himself stated that he had ample actual knowledge of these long-standing County policies, practices and customs when he became Defendant Harris County's Sheriff and administrator of this jail, where, due to said well-established policies, practices and customs, the deaths and injuries of inmates has only increased, despite Defendant's Sheriff Gonzalez taking over the jail administration. *Id*.

### vi.     SUBSEQUENT EVENTS ALSO SHOW DISPOSITION

64.     The deliberately indifferent disposition of the Defendant may also "be inferred from conduct after the events" of the underlying incident. *See e,g., Grandstaff v. City of Borger, Tx*. 767 F.2d 161, 171 (5th Cir. 1985).  Here, after the Decedent's incident, the TCJS continued issuing reports which add evidence showing Defendant's policymaker's deliberate indifference.

65.     On February 13 to 17, 2023, the TCJS conducted a special investigation of Defendant Harris County in response to numerous deaths within the jail from December 2022 and January 2023.  On March 8, 2023, the TCJS issued its report which again found that Defendant Harris County was non-compliant with numerous minimum jail standards established by law and regulations.  Notably, the TCJS noted that the same areas that were supposed to have been corrected by Defendant Harris County, after previous non-compliance reports, in reality had not yet been addressed or fixed.  Firstly, the TCJS found that numerous detainees were supposed to be booked, medically evaluated, and placed in detainee housing within forty-eight (48) hours of arrest, but instead they were being held in holding cells without proper evaluation for much longer than the forty-eight (48) minimum.  Secondly, the TCJS found that Defendant Harris County

33

continued to be non-compliant as to not providing timely and sufficient medical care to detainees. Specifically, the TCJS found that detainees were not being seen within forty-eight (48) hours after placing medical requests in medical kiosks. Thirdly, the TCJS found that several officers who were supposed to have suicide preventing training had not received the training in accordance with jail polices. Fourth, the TCJS also found that Defendant Harris County continued to be in non-compliance with the minimum observation requirements, and that the jail staff, on a "*routine basis*" (custom), exceeded the minimum observation requirements for detainees that required sixty-minute intervals by up to one (1) hour and thirteen (13) minutes. Fifth, the TCJS also found that "staffing was not sufficient to perform the required functions" despite Defendant's documentation that alleged that they did have enough staff. Particularly, the staff on the third (3rd) floor of the jail facility located at 701 Baker Street only had thirteen (13) officers when fourteen (14) were needed, and the fourth (4th) floor only had thirteen (13) when fifteen (15) were needed. Hence, Defendant Harris County does not have sufficient staff to perform required functions which include "transporting of inmates, medications passes, face to face observations and feeding."

66.     Separately, in a more recent TCJS report dated April 17, 2023 it shows the continued and unchanged deliberate indifferent disposition of Defendant's policymaker. Following the in-custody death of Fabien Cortez, described elsewhere in this petition, the TCJS again found the Defendant non-compliant with even minimum standards. To be more precise, the TCJS found that Cortez was permitted to enter a restroom for eighty-eight (88) minutes before he was discovered dead and with medical care being failed to be provided to him. And, again on August 28, 2023, the TCJS again issued yet another notice of non-compliance telling Defendant that regular observation by corrections officers of the inmates was always required, and that the number of jailers was not adequate or acceptable. Thus, the proper ratio was still not being

34

maintained by the Defendant, in violation of the standards established by law or regulation, and once again establishing that the Defendant had a different, and well-established custom, policy or practice that has been the moving force of constitutional rights' violations in the County jail. The Defendant cannot seriously claim in this case, or any other, that it is following the law, obeying the constitution, and respecting the statutory and constitutional civil rights of the inmates it has under its care and custody in its local county jails.

### C. CONSTITUTIONAL VIOLATION AND MOVING FORCE

#### i. THE CONSTITUTIONAL VIOLATION

67.     Thompson suffered constitutional violations whose moving force was the Defendant Harris County's well-established and well-known custom, policy or practice, which has not changed for years, if not decades. As an initial point, the Fourth Amendment enshrines the right to be free from excessive force. *Castro v. Kory*, 2024 U.S. App. LEXIS 8805 *11-12 (5th Cir. 2024). Separately, the constitutional rights of a pretrial detainee, like the Decedent, flow from the procedural and substantive due process guarantees of the Fourteenth Amendment of the U.S. Constitution. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996); *Valencia v. Wiggins*, 981 F.2d 1440, 1443-45 (5th Cir.), cert. denied, 113 S. Ct. 2998 (1993); *see also Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *102 (S.D. Tex. 2018) (finding issues of material fact precluded summary judgment on denial of medical care claim); *Wynn v. Harris Cty.*, 556 F. Supp. 3d 645, 655 (S.D. Tex. 2021) (Ellison, K.) (finding that, under the Due Process Clause of the Fourteenth Amendment, Harris County jail pre-trial detainees have a constitutional right to "basic human needs, including medical care and protection from harm").

68.     Indeed, it is well established that, when the State or arm of the State takes a person into custody and holds the person in a jail involuntarily, against its will, the U.S. Constitution

imposes upon the State numerous corresponding duties to assume some responsibility for that person's safety and general well-being. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). The ultimate constitutional duty of the government in those circumstances is to assume some responsibility for the safety and general well-being of persons whose state-occasioned confinement renders them unable to fend for themselves. *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996). In addition to the right to be free from excessive force, those clearly established constitutional duties is to provide appropriate medical care. *Sanchez v. Young County*, Tex., 866 F.3d 274, 279 (5th Cir. 2017). Which means that Thompson had a constitutional right to have his serious medical needs met by the County jail administrators, and to be protected from custom, policy or practice that shows deliberate indifference to his civil rights. *See Sims v. Griffin*, 35 F.4th 945, 949 (5th Cir. 2022); *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001). A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required. *Sims v. Griffin*, 35 F.4th 945, 949 (5th Cir. 2022); *see also Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *104 (S.D. Tex. 2018). As such, when a jail official refuses to treat an inmate, ignores his complaints, intentionally treats him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs, the constitution has been violated. *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006).

69.     More specifically, if an inmate suffers as a consequence of the jail staff's wanton disregard of his or her medical needs, the Due Process Clause of the Fourteenth Amendment has been violated. *Austin v. City of Pasadena*, 74 F.4th 312, 327 (5th Cir. 2023); *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020); *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001). To that point, the purpose of requiring state jail officials to provide medical care to a pretrial detainee,

36

like the Decedent, is to prevent the detainee from suffering further physical pain or harm. *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996). Given so, a delay in medical care violates the Constitution where it has been done with deliberate indifference that results in substantial harm. *Austin v. City of Pasadena*, 74 F.4th 312, 327 (5th Cir. 2023); *Dyer v. Houston*, 964 F.3d 314, 327 (5th Cir. 2020). Here, in part, that is show by the fact that the Defendants viciously beat Thompson with excessive force, encouraged each other on, and then denied him medical care— instead, having sit in a cell with a fractured jaw for days.

### ii.    MOVING FORCE

70.    Magic words are not required to pled or show the moving force requirement. *Garza v. Guerra*, 2009 U.S. Dist. LEXIS 3304 *23 (S.D. Tex. 2009) (Hanen, A.) (noting the same). Instead, for moving force purposes, a plaintiff need only show that the municipal action or inaction was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights. *Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *9 (S.D. Tex. 2018). A plaintiff meets the culpability showing if the municipality adopted a policy with deliberate indifference to the "known or obvious consequences" that a constitutional violation would result. *Id*. Here, Thompson's theory of causation is glaringly obvious: he alleges custom that included: (1) the institutionalization of excessive force by officers against pre-trial detainees, (2) denial of adequate medical care, (3) failure to properly observe and monitor detainees, and (4) overcrowding and understaffing and that he was injured by those customs, policies or practices.

71.    Again, out of abundance of caution, and for purposes of brevity, the Plaintiff hereby adopts by reference the facts and statements contained in the pleadings of the *Wagner v. Harris*

37

*Cnty*. case, mentioned above. Fed. R. Civ. P. 10(c). Alternatively, Plaintiff respectfully requests the Court to take judicial notice of said pleadings in said case.

**COUNT 3 – FAILURE TO SUPERVISE**
*(Against Defendant Harris County)*

72.     Thompson incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

73.     In the Fifth Circuit the elements for a failure-to-supervise claim are (1) the sheriff in his official capacity failed to supervise, (2) a causal connection between that failure-to-supervise and the violation of the plaintiff's rights, and (3) such failure to supervise or train amounted to gross negligence or deliberate indifference. *Doe v. Taylor Indep. School Dist.*, 15 F.3d 443, 452 (5th Cir. 1994). To that end, the Fifth Circuit has never required that a supervisory official be warned of the precise act that the subordinate official subsequently commits, rather, all that the Fifth Circuit (and the Supreme Court) requires is that supervisory officials just be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists. *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998).

    **A.**     **THE FAILURE TO SUPERVISE AND CAUSAL CONNECTION**

74.     Here, first, Defendant Harris County's Sherriff failed to supervise his jailers, allowing them to use excessive force on inmates, like Thompson and others, and also deny them medical care for their serious medical needs.

75.     Second, there is a causal connection between those failures-to-supervise and the violation of Thompson's rights. In this regard, liability of the County here depends upon if it should have been obvious to the Sherriff— or stated differently, whether Defendant's Sherriff had sufficient notice— that the failure to supervise the Defendants was likely to lead to a constitutional violation. *Compare Brown v. Bryan County*, 219 F.3d 459, 460 (5th Cir. 2000). To which, two

38

things may be of importance. The first is whether it should have been obvious to the Defendant that the highly predictable consequence of not supervising its jail staff would lead to the violation of pre-trial detainee's constitutional rights, and the second is that this failure to supervise was a "moving force" with a causal connection to the constitutional injury. _Brown_, 462 (5th Cir. 2000).

76.    Here, the rights at issue begin with the right to be free from the use of excessive force. .  _Castro v. Kory_, 2024 U.S. App. LEXIS 8805 *11-12 (5th Cir. 2024).  Separately, pre-trial detainees, like Thompson, have rights under the Due Process Clause of the Fourteenth Amendment to have their "basic human needs, including medical care and protection from harm" met.  _Wynn v. Harris Cty._, 556 F. Supp. 3d 645, 655 (S.D. Tex. 2021) (Ellison, K.).  As explained further elsewhere, when the state takes a person into custody and holds him there against his will, the Constitution imposes upon the state several corresponding duties including the duty to assume some responsibility for his safety and general well-being.  _Helling v. McKinney_, 509 U.S. 25, 31 (1993).    And, here, it should have been obvious to the Sheriff that the highly predictable consequence of not supervising its jail staff to ensure that they properly observed/monitored the prisons, provided sufficient/adequate/timely medical care to inmates, and did not bring drugs into the facility would have led to the injuries suffered by the Decedent.

**B.    DELIBERATE INDIFFERENCE**

77.    Third, Defendant's actions and inactions amounted to deliberate indifference. Here, the Defendant knew about its failure-to-supervise "infractions, but did nothing to correct them." _Compare to Tuttle v. Sepolio_, 2023 U.S. App. LEXIS 12834 *11 (5th Cir. 2023) (finding that multiple instances of the same sort of conduct permitted a failure-to-supervise claim to proceed forward).  As detailed elsewhere in the Complaint, Defendant Harris County had full knowledge of the civil rights violations occurring in the County jail obtained from numerous

39

sources; namely, from a DOJ Report, several TCJS Reports, other lawsuits, settlements, and the public statements of its own policy makers (*i.e*., the Sheriff). But, on top of that, a pattern of incidents before and after the incident show a deliberately indifferent disposition.

### i. PATTERN OF PRECEEDING INCIDENTS

78. Third, Defendant's actions and inactions amounted to deliberate indifference. Here, the Defendant knew about its failure-to-supervise "infractions, but did nothing to correct them." *Compare to Tuttle v. Sepolio*, 2023 U.S. App. LEXIS 12834 *11 (5th Cir. 2023) (finding that multiple instances of the same sort of conduct permitted a failure-to-supervise claim to proceed forward). As detailed elsewhere in the Complaint, Defendant Harris County had full knowledge of the civil rights violations occurring in the County jail obtained from numerous sources; namely, from a DOJ Report, several TCJS Reports, other lawsuits, settlements, and the public statements of its own policy makers (*i.e*., the Sheriff). But, on top of that, a pattern of incidents before and after the incident show a deliberately indifferent disposition.

79. The following incidents show Defendant Harris County's above summarized customs as well as Defendant Harris County's notice of said customs and deliberate indifference:

    a. **Terry Goodwin**. On June 2, 2015, Defendant Harris County settled Goodwin's deliberate indifference claims for $400,000.00. Goodwin had been locked in a cell for months without observations other than food placed under his door with a sign telling officers not to open the cell. During this time, Goodwin's mental and physical health deteriorated which ultimately required a stay at a mental health facility. At some point, a jail compliance team entered Goodwin's cell and found him filthy with a shredded jail uniform with shards of clothing hanging from the ceiling where he had attempted to hang himself. The cell had not been opened for months with observations not being conducted other than food placed under his door with a sign on the door telling officers not to open the cell. Officers, supervisors, medical staff and the head of the jail knew for weeks about Goodwin's conditions of confinement. Defendant Harris County, however, did not begin an investigation into this until almost a year after Goodwin was discovered by a whistleblower. Defendant Harris County's Sheriff openly admitted that there were "breakdowns in leadership" that "led to an

atmosphere" of "deference."  The failure to properly observe and monitor Goodwin and conduct proper face-to-face observations led to inadequate medical care being provided to him and allowed him to be stuck in inhumane conditions in his own feces and waste that was the moving force in the cause of his injuries.  Failure to provide Goodwin with medication and medical attention for his known medical needs including his mental illness led to the deprivation of Goodwin's constitutional rights by being deliberately indifferent to the known and obvious risk that led to his injuries.  This incident bears similarities to Thompson's incident.

b.    **Rachel Hatton**.  On or around May 7, 2016, a Defendant Harris County jailer booked Hatton into the Harris County Jail.  While Hatton waited in line with other detainees, one of Defendant Harris County's jailers abruptly and unreasonably with overwhelming force charged and punched her, causing her to lose consciousness.  "Oh my gosh, her head!" yelled an inmate who witnessed that unnecessary violence and excessive force.  Upon information and belief, for some time thereafter, Hutton was denied immediate medical care.  After which, Hutton woke up in the clinic and was returned to her cell.  There, Hutton asked the guards all night asking for medical care but they never responded.  As such, this incident bears similarities to Thompson's incident.

c.    **Vincent Young**.  On February 7, 2017, a Defendant Harris County jailer booked pre-trial detainee Young into its jail facility.  *Wynn v. Harris Cty.*, 556 F. Supp. 3d 645, 648 (S.D. Tex. 2021) (Ellison, K.).  During intake, he complained of serious medical conditions such as back pain, high blood pressure, anxiety, and depression.  *Id*.  Defendant Harris County ordered Young's abrupt cessation with Xanex, and replaced it with Librium, a side of effect of which is suicidal tendencies which is also a side effect of Xanex withdrawal.  After which, Young advised Defendant Harris County that he wanted to kill himself.  *Id*.  Deliberately indifferent, however, Defendant Harris County failed to act, and Young did, in fact, kill himself.  *Id*.  Upon investigating Young's death, the Texas Commission on Jail Standards issued the Defendant a notice of non-compliance finding that Harris County had failed to meet the minimum by forty-four (44) minutes.  As it turned out, Defendant Harris County had failed to step inside Young's cell for six (6) hours.  The jailer responsible for checking Young's cell had recorded numerous cell checks that had actually never happened, stating that he was too busy doing other jobs to conduct proper rounds.  The Texas Rangers found numerous discrepancies in round sheets where rounds were said to be conducted when, in fact, they were not conducted at all or were done improperly.  Failure to properly observe and monitor Young and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Young's death.  Failure to provide Young with his medications and medical attention for his ongoing mental and physical issues led to the deprivation of Young's

41

constitutional rights by being deliberately indifferent to the known and obvious risk that led to Young's death. As such, this incident bears similarities to Thompson's incident.

d. **Maytham Alsaedy**. At all times relevant, Defendant Harris County knew that Alsaedy had serious and persistent mental illness that required medical attention. Defendant, however, failed to properly treat Alsaedy for his mental illness. On November 30, 2017, Alsaedy covered his cell's window with paper, and Defendant Harris County never noticed the paper, made him remove the paper, or even attempted to observe Alsaedy in his cell. Defendant Harris County failed to make any face-to-face or any other visual observation of Alsaedy. While Defendant Harris County was deliberately indifferent, Alsaedy hanged himself. After which, the Texas Commission on Jail Standards once again found that Harris County was not compliant with the minimum observation requirements as the jail had permitted Alsaedy to place paper over his view panel, failed to make him remove the paper, and failed to make any visual check on Alsaedy for the required time period. The failure to provide Alsaedy with his medications and medical attention for his ongoing mental and physical issues led to the deprivation of Alsaedy's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Alsaedy's death. Hence, this incident bears similarities to Thompson's incident.

e. **Debora Ann Lyons**. A Defendant Harris County jailer booked Lyons into the jail facility. At which, Lyons had a history of mental illness and making suicidal statements. On August 14, 2018, Lyons exited her cell to receive insulin, grabbed a sheet, and placed it around her waist. Thereafter, she entered a multi-purpose room and closed the door behind her. Defendant Harris County then failed to observe her throughout this time, and did not conduct a face-to-face observation with her during normal rounds. Because of this deliberate indifference and conditions of confinement, Lyons was able to kill herself. After which, the Texas Commission on Jail Standards issued yet another notice of non-compliance. Failure to properly observe and monitor Lyons and conduct proper face-to-face observations led to inadequate medical being provided to her in a timely manner and ultimately caused her farther. Failure to provide Lyons with her medications and medical attention for her ongoing mental and physical issues led to the deprivation of Lyons' constitutional rights by being deliberately indifferent to the known and obvious risk that led to Lyon's death. Hence, this incident bears similarities to Thompson's incident.

f. **Christopher Johnson**. On August 21, 2018, Defendant Harris County settled with Johnson. Before then, a Defendant Harris County deputy detained Johnson and took him to take a booking photograph (i.e., a mug shot. *Johnson v. Harris County*, 2018 U.S. Dist. LEXIS 239371 *1 (S.D. Tex. 2018). Johnson smiled, and Defendant Harris County's deputy told

42

Johnson: "If you don't stop smiling, we gon' to make you stop smiling." *Id.*, *4. Defendant Harris County's deputy then abruptly and violently with overwhelming force grabbed Johnson's neck and used excessive force to do so. *Id.*, *24-25. After which, Defendant Harris County refused to provide Johnson with medical treatment for his serious injuries. Then, to make matters worse, Defendant Harris County falsified reports on what transpired. In light of all of that, failure to provide Johnson with medical attention for his injuries led to the deprivation of Johnson's constitutional rights by being deliberately indifferent to the known and obvious risk. Given all this, this incident bears similarities to Thompson's incident.

g.    **Michael Alaniz**. On August 24, 2018, Defendant Harris County settled with Alaniz in the case stylized as *Alaniz v. Two Unknown Harris County Office Deputies*, Cause No. 4:16-cv-01495 (S.D. Tex., filed May 27, 2016). Before then, in a four-by-eight (4x8) closet cell, Defendant Harris County jailers had abruptly and overwhelmingly struck Alaniz with two (2) hands just under his scapulae near his thoracic spine without any provocation or warning. After which, Alaniz fell forward landing directly on his face with the tip of his nose. While Alaniz was on the ground, Defendant Harris County's jailers grinded Alaniz's skull, nose-first into the cold concrete floor with one knee firmly planted in the middle of Alaniz's back. Then, the Defendant Harris County's jailers smashed a boot to the Alaniz's face while he lay helpless on the ground and unconscious. After which, Alaniz requested medical attention for his serious medical injuries but the Defendant denied to provide him such treatment. In light of all of that, failure to provide Alaniz with medical attention for his injuries led to the deprivation of Alaniz's constitutional rights by being deliberately indifferent to the known and obvious risk. Hence, this incident bears similarities to Thompson's incident.

h.    **Tracey Whited**. A Defendant Harris County jailer booked Whited into its jail facility. During her stay, she had a history of serious mental illness and making suicidal statements. On January 14, 2019, Defendant Harris County failed to observed Whited attempting to hang herself while she was in a general population cell. Instead, an inmate advised Defendant Harris County that Whited had hung herself. And, because of Defendant Harris County's deliberate indifference, Whited successfully killed herself. Thus, the failure to provide Whited with medical attention for her ongoing mental issues and suicidal ideations led to the deprivation of Whited's constitutional rights by being deliberately indifferent to the known and obvious risk that led to his death. Hence, this incident bears similarities to Thompson's incident.

i.    **Kenneth Lucas**. On January 29, 2019, Defendant Harris County settled Lucas's deliberate indifference claims for $ 2.5 million. Before that, Defendant Harris County jailers, dressed in protective clothing, had lined

43

up in a single file "stick," entered Lucas' cell, and forced Lucas to the floor using a Plexiglas shield, handcuffed him, shackled his legs, which were then crossed and bent back at the knees. *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *8 (S.D. Tex. 2018). Defendant Harris County then placed Lucas face down onto a gurney for transport. *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *8 (S.D. Tex. 2018). After which, the Defendant heard Lucas say, "I can't breathe," and Defendant Harris County did nothing because "[i]f you're talking, you're breathing." *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 212983 *26 (S.D. Tex. 2018). Thereafter, the Defendant Harris County did not tell the doctors that Lucas had said that he could not breathe. *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 212983 *26 & *50 (S.D. Tex. 2018). Such an inability to breathe is a serious medical need of which all reasonable officers would be aware and is not subject to debate. *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 212983 *27 (S.D. Tex. 2018) (finding that a "reasonable jury could conclude that Harris County trained its officers to ignore complaints" and "that that training reflects deliberate indifference to a serious medical need."). Hence, this incident bears similarities to Thompson's incident.

j.   **Kareem Jefferson**.  On May 29, 2019, Defendant Harris County was in the process of releasing Jefferson from its jail facility. During which time, a Defendant Harris County jailer abruptly and with overwhelming force violently slammed Jefferson to the ground, seriously injured him, and placed him into back into custody. Upon information and belief, Defendant Harris County then failed to then provide Jefferson with adequate medical care to attend to serious injuries that it had just then caused to Jefferson. Hence, this incident bears similarities to Thompson's incident.

k.   **Natividad Flores**.  On July 27, 2019, Defendant Harris County arrested and transported Flores to its jail facility. Upon arrival, Flores disclosed a serious medical condition— epilepsy. During intake, Flores asked Defendant Harris County for his prescribed mediation but Defendant Harris County refused to provide it. Further being deliberately indifferent, Defendant Harris County assigned Flores to a top bunk when a bottom bunk is more appropriate for an individual with a serious epilepsy medical condition. On July 29, 2019, Flores suffered from a seizure while on the top bunk and fell to the floor. There, he suffered a serious head injury where he bled excessively and was in excruciating and radiating pain. Upon information and belief, Defendant Harris County then delayed in providing medical care. Flores thereafter filed a lawsuit against Defendant Harris County, stylized as *Natividad Flores v. Harris County*, 4:20-cv-03162, Dkt. No. 72 (S.D. Tex. filed May 10, 2022) in which the Defendant settled with Flores, paying him an undisclosed amount. Hence, this incident bears similarities to Thompson's incident.

l.  **Wallace Harris**.  On May 1, 2020, Defendant booked Harris into it jail facility.  At the time, he had serious medical conditions such as hypertension which required ongoing medication and medical care.  Defendant Harris County, however, failed to provide Wallace Harris with adequate medical screening or medical care during his time in jail.  On May 6, 2020, Wallace Harris died a result of his medical condition.  Before that, however, Defendant Harris County had failed to properly observe and monitor Wallace Harris and conduct proper face-to-face observations and to provide him with medical care.  Moreover, the failure to provide Wallace Harris with medication and medical attention for his ongoing medical condition led to the deprivation of Wallace Harris' constitutional rights by being deliberately indifferent to the known and obvious risk that led to Harris' death.  Hence, this incident bears similarities to Thompson's incident.

m.  **David Perez**.  On September 9, 2020, Defendant booked Perez into its jail facility.  Upon information and belief, Defendant Harris County failed to then adequately conduct a medical screening.  On September 15, 2020, Perez died and his medical cause of death allegedly "could not be determined."  Failure to properly observe and monitor Perez and conduct proper face-to-face observations lead to inadequate medical care being provided to Perez in a timely manner and ultimately caused Perez's death.  Hence, this incident bears similarities to Thompson's incident.

n.  **Elijah Gamble**.  On or around November 2020, Defendant booked Gamble into its jail facility.  Ellijah Gamble, a member of the vulnerable LGBQT+ community, had a disagreement with another detainee, and asked to be removed from their cell, but Defendant Harris County refused.  In front of Defendant Harris County, the other detainee punched Ellijah Gamble, and knocked them down.  Then, the other detainee provided to stomp Ellijah Gamble all while Defendant Harris County watched and did not interfere.  Although Gamble needed immediate medical attention, Defendant Harris County did not immediately provide it.  After several minutes, however, Defendant Harris County finally came into Ellijah Gamble's cell only after he was crawling to the door.  Ellijah Gamble's jaw was broken.  Defendant Harris County, however, refused to wire Ellijah Gamble's mouth shut, and refused to provide Ellijah Gamble with a liquid diet.  As such, Ellijah Gamble suffered.  Thus, the failure to properly observe, monitor, and intervene when Ellijah Gamble was beat up by the other detainee despite requesting to be removed from the presence of that detainee led to inadequate protection and inadequate medical care being provided to him in a timely manner and ultimately caused Ellijah Gamble's injuries as timely intervention would have prevented his injuries, and adequate monitoring would have allowed immediate medical intervention.  Hence, this incident bears similarities to Thompson's incident.

45

o.   **Israel Lizano Iglesias**.  On February 8, 2021, Defendant Harris County booked Iglesias into its jail facility.  Defendant Harris County, however, did not immediately screen Iglesias for serious medical or mental health concerns.  Instead, Iglesias was placed in a holding cell.  During which time, Defendant Harris County did not properly observe Iglesias.  Rather, other detainees had to inform Defendant that Iglesias needed medical attention.  Iglesias became unresponsive and was pronounced dead.  Failure to properly observe and monitor Iglesias and conduct proper face-to-face observations led to inadequate medical provisions to Iglesias in a timely manner and ultimately caused Iglesias' death.  Failure to provide Iglesias with medication and medical attention for his ongoing medical condition led to the deprivation of Iglesias's constitutional rights being deliberately indifferent to the known and obvious risk that led to Iglesias' death.  Hence, this incident bears similarities to Thompson's incident.

p.   **Jaquaree Simmons**.  On February 16, 2021, Defendant Harris County finally responded to water flowing under Simmons' cell door from a clogged toilet.  The only report about the incident disciplined Simmons, and stated that he was removed from his cell while it was cleaned and he was thereafter placed back into his cell "without incident" and with no report of any use of force being used.  That, however, was untrue.  Defendant Harris County had actually beat up Simmons causing a lacerated lip and eye swelling above his left eye, and then placed him in a cell that was less than fifty (50) degrees Fahrenheit.  After which, Defendant Harris County denied Simmons with adequate medical care.  Later that day, Defendant Harris County again entered Simmons' cell and viciously beat him. After which, again, Defendant Harris County denied Simmons with adequate medical care and he died.  Thereafter, on April 6, 2021, the Texas Commission on Jail Standards had issued a notice of non-compliance, finding that the Defendant had failed to conduct proper face-to-face observations for over four (4) hours on the date that Simmon's died.  Failure to properly observe and monitor Simmons and conduct face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately was a moving force in Simmon's death.  Hence, this incident bears similarities to Thompson's incident.

q.   **Deon Peterson**.  Peterson is a plaintiff in the pending *Wagner I* and *Wagner II* case against Defendant Harris County.  He was admitted to the Jail with a known history of heart disease and high blood pressure. *Wagner II*, *9. While there, he complained of left arm pain, but did not receive any medical intervention.  *Id*., 10.  He later complained of chest pain and difficulty breathing.  *Id*.  He was summarily assessed by the clinic before being sent back to his cell without any treatment. *Id*.  He returned to the clinic when his symptoms continued, where he passed out while waiting to be seen by staff.  *Id*.  Later that day, Peterson passed away due to an issue with his heart.  *Id*.  In all, this incident bears similarities to Thompson's incident.

46

r.   **Rory Ward, Jr**.  On May 8, 2021, Defendant Harris County's detainee Melvin Johnson brutally assaulted Ward.  During which time, Defendant Harris County observed Johnson stand over Ward and punch him six (6) times in the head while Ward lay on the ground lifelessly.  As a result, Ward suffered a hemorrhage, intracranial hypertension, and brain death as well as visible bruising to his forehead and swelling around his right eye.  Despite the obvious need for immediate medical attention, Defendant Harris County delayed in providing it.  When it was eventually provided, Defendant Harris County only provided Ward with only minor treatment for his injuries without diagnostic studies in the jail's medical clinic.  Before then, the Department of Justice had cited Defendant Harris county's medical clinic as inadequate to treat such serious injuries.  Nevertheless, Defendant Harris County thereafter placed Ward back in a single cell without any further medical attention or sufficient observation or monitoring in light of his condition and known head injuries.  After a continued failure to observe Ward either through video or face-to-face observations, Defendant Harris County eventually discovered Ward dead in his cell.  That all said, this incident bears similarities to Thompson's incident.

s.   **Gregory Barrett**.  On June 30, 2021, Defendant Harris County booked Barrett into its jail facility at which time it became aware of Barrett's pre-existing medical conditions.  On August 26, 2021, Barrett told his wife during visitation that he did not feel well and was vomiting blood.  Defendant Harris County, however, did not provide him with medical treatment.  Thereafter, the next day on Augst 27, 2021, Barrett continued to vomit blood and still had not received any medical attention despite the obvious need for it.  Instead, Barrett was relegated to a solitary quarantine cell in lieu of receiving treatment for his non-COVID symptoms and pre-existing medical conditions where he would die.  That all said, this incident bears similarities to Thompson's incident.

t.   **Tron Madise**.  On or around September 10, 2021, pre-trial detainee Madise was in the custody of Defendant Harris County and was assaulted by eight-to-ten (8-10) inmates at the Harris County Jail.  Although Defendant Harris County's guards, Charles Ballard, Bryan Buccini, Paul Croas, Edmon Benavides, A. Davis, and at least three more John Doe officers could have easily intervened, they failed to do so.  Instead, they watched a five (5) minute beating of Madise, and delayed in providing him with timely, adequate and sufficient medical care.  As a result, Madise has sustained multiple injuries to multiple body parts.  That all said, this incident bears similarities to Thompson's incident.

u.   **Jerome Bartee**.  On October 28, 2021, the Defendant Harris County settled with Bartee.  Before then, Bartee was a pretrial detainee at the Defendant's jail.  More than ten (10) of Defendant Harris County's Detention Officers

viciously beat Bartee and caused him to suffer permanent injuries. *Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *2 (S.D. Tex. 2018). After which, upon information and belief, Defendant Harris County denied Bartee medical care for his serious injuries. Hence, this incident bears similarities to Thompson's incident.

v.   **Fred Harris**. During intake, Defendant Harris County became aware that nineteen (19) year-old Fred Harris "is a person with mental illness or intellectual disability. Nevertheless, Defendant Harris County placed Harris in a cell with Michael Paul Ownby, a known violent inmate weighing two-hundred and forty (240) pounds. Ownby had a conviction for felony assault, had previously attacked and injured a Jail detention officer, and had also assaulted an inmate on another occasion. As foreseeable, on October 29, 2021, Ownby attacked Fred Harris with a shank, knocked him to the concrete floor and began smashing his head into it. Then, Ownby kicked Harris while he lay on the floor all while Defendant Harris County just simply watched, both in person and on video. As there was not enough jail staff, Fred Harris was denied immediate necessary medical care. At Ben Taub, Harris was declared brain dead and his organs were donated. That all said, this incident bears similarities to Thompson's incident.

w.   **Evan Ermayne Lee** (**First Incidents**). Evan Ermayne Lee is the daughter of two plaintiffs in the pending *Wagner I* and *Wagner II* case against Defendant Harris County. According to *Wagner II*, on December 22, 20221, Lee entered the Jail with known medical conditions including high blood pressure, diabetes, manic depression, schizophrenia, anxiety, and bipolar disorder. *Id*., 6. Throughout his time at the Jail, medication for those conditions was frequently denied or delayed. *Id*. He was eventually beaten by another detainee, during which Jail staff failed to intervene. *Id*., 6-7. Despite suffering visible injuries, he was not seen by the Jail clinic until two days after the assault. *Id*., 7. The clinic provided no treatment or diagnostic testing related to his head injuries. *Id*. He was transported to a hospital where it was discovered that he beating had caused blunt force trauma and multiple brain bleeds. *Id*. Shortly thereafter, he was ruled braindead, and he died two (2) days later. *Id*. That all said, this incident bears similarities to Thompson's incident.

## ii.   CONDUCT AFTER THE EVENTS

80.   The deliberate indifferent disposition of a Sherriff in the Fifth Circuit may also "be inferred from conduct after the events." *See e,g., Grandstaff v. City of Borger, Tx*. 767 F.2d 161, 171 (5th Cir. 1985). Here, it is shown by the following pattern of subsequent incidents:

48

a.      **Henry Williams**.  On February 21, 2022, Williams was in Defendant Harris County's custody with the following known medical conditions: gout, high blood pressure, and arthritis.  For at least three and a half (3.5) weeks, Defendant Harris County failed to provide Williams with medication for the same.  Then, on February 21, 2022, Williams notified the Defendant Harris County that he was having a gout attack, and needed the evening pill nurse.  Defendant, however, replied that "They are short of staff, and no one would be bringing [the] medication up, and triage would also be closed.  The next day on February 22, 2022, Williams again put Defendant Harris County on notice that he was having a gout attack.  There, however, was no reply whatsoever.  On February 28, 2022, Williams then filed a grievance with Defendant Harris County stating that he had been without medicine for a considerable period of time.  Defendant Harris County then informed Defendant's employee Gwen Bossett via letter of the same, and she came back and stated, "I asked to bring you meds, and was told no."  On March 2, 2022, Williams again notified Defendant Harris County that he was without medications, but the Defendant replied that they do not have staff.  As a result of this deliberate indifference, Williams suffered injury.  That all said, from this incident, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

b.      **Evan Ermayne Lee (Second Incidents)**.  Evan Ermayne Lee is the daughter of two plaintiffs in the *Wagner I* and *Wagner II* case against Defendant Harris County.  Her incidents prior to Thompson's incidents are described above.  According to *Wagner II*, a little over a month after Thompson's incident on March 9, 2022, Lee beaten by another detainee, during which Jail staff failed to intervene. *Id*., 6-7.  Despite suffering visible injuries, he was not seen by the Jail clinic until two days after the assault. *Id*., 7.  The clinic provided no treatment or diagnostic testing related to his head injuries. *Id*.  He was transported to a hospital where it was discovered that he beating had caused blunt force trauma and multiple brain bleeds. *Id*.  Shortly thereafter, he was ruled braindead, and he died two (2) days later. *Id*.  That all said, from this incident, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's sheriff may be inferred.

c.      **Matthew Shelton**.  On March 22, 2022, Defendant Harris County booked Shelton into its custody.  At the time, Defendant Harris County became aware of Shelton's serious medical conditions which included diabetes and high blood pressure for which he required mediations.  Although Shelton was required to take medications for those conditions, Defendant Harris County's overcrowding, understaffing, and policies of failing to provide medical care and medications led to Shelton not receiving his at all after being placed into his cell.  Ultimately, on March 27, 2022, died a diabetic ketoacidosis. Thereafter, on December 19, 2022, the Texas Commission on

Jail Standards issued a Notice of Non-Compliance, finding that Defendant Harris County had failed to meet even minimum jail standards by not providing Shelton with his medications despite orders to do so. That all said, from this incident, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

d.    **Simon Peter Douglas**.  On February 10, 2022, Defendant Harris County booked Douglas.  During which time, Douglass began exhibiting erratic behavior consistent with mental illness.  Defendant Harris County placed Douglas in an isolation cell where the attempted to hang himself.  Defendant Harris County then handcuffed Douglass, and placed him in a single padded room which still had hard objects on the door and wall, and a metal grate in the middle of the floor.  Despite knowing Douglas' behavior, Defendant Harris County did not restrain Douglas any further, did not place him in a suicide vest, and did not attempt to remove damaging items.  Douglas then began ramming his head against the door, walls, and the metal grade continuously while Defendant Harris County watched him harm himself repeatedly.  Defendant Harris County waited for Douglas to knock himself out and then went in and carried Douglas out on a stretcher.  Before arriving at the hospital, Douglas was declared dead.  That all said, from this incident, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

e.    **Ryan Twedt**.  Ryan Twedt is a plaintiff in the *Wagner I* and *Wagner II* case. According to *Wagner II*, Twedt suffers from bipolar disorder and anxiety, all of which require medical attention.  *Id*., 17.  Twedt was booked into Defendant Harris County's jail facility on February 15, 2022.  After which, the Jail regularly delayed or denied Twedt the necessary medication to treat his disorders.  Without his medication, Twedt's actions became erratic, and he was involved in an altercation with another detainee on April 8, 2022. *Id*.  The officer responding to the incident threatened Twedt, stating that, if he was ever moved to the 6th floor of the facility, the officers would "beat his ass." *Id*., *17-18.  Twedt was eventually transferred to the 6th floor.  *Id*., 17.  After his transfer, the officers ordered Twedt's two cellmates to leave the cell.  *Id*.  They then handcuffed Twedt, slammed him against the wall and ground, and then beat him while he was shackled.  *Id*.  In doing so, the officers broke one of Twedt's fingers, bruised his ribs, and caused lacerations to his head.  *Id*.  Because the clinic would not provide proper medical care, Twedt's broken finger has healed improperly, and he still suffers from short-term memory loss.  *Id*.  That all said, from this incident, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

f.    **Shane Gus Mitchell**.  Defendant Harris County booked Mitchell into its jail facility.  Upon information and belief, either Defendant Harris County failed to properly conduct an adequate or sufficient medical screening or

50

Defendant Harris County had notice of Mitchell's serious medical conditions related to his blood pressure. Defendant Harris County delayed in providing Mitchell with medical care, and in or around March 2022, Mitchell died as a result. Hence, Defendant Harris County's continued and unchanged deliberately indifferent disposition may be inferred from this incident as well.

g.    **Kenneth Ray Harris**. On or around March 9, 2022, Defendant Harris County booked Kenneth Ray Harris into its jail facility. Upon information and belief, either Defendant Harris County failed to perform an adequate medical screening or Defendant Harris County had notice of Kenneth Ray Harris' serious medical conditions relating to his heart. After which, Defendant Harris County failed to provide Kenneth Ray Harris with timely, adequate and sufficient medical care, and on June 20, 2022, he ultimately went into cardiac arrest and died. That all said, from this incident, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

h.    **Gilbert Allen Nelson**. On February 10, 2021, Defendant Harris County booked Nelson into its jail facility. Thereafter, due to a lack of medical care and hygiene within Defendant Harris County's jail, Nelson contracted a urinary tract infect and did not receive proper medical treatment for this serious medical condition despite the obvious need for it. Moreover, Defendant Harris County also did not properly monitor and observe Nelson as it did not conduct face-to-face observations to determine if he was in need of medical attention within a sufficient amount of time. On May 11, 2022, as detention officers were not monitoring Nelson, other detainees had to inform it that Nelson was unresponsive in his bunk. A few hours later Nelson was declared deceased with sepsis due to his untreated urinary tract infection. Hence, from this incident, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

i.    **Kristan Smith**. Kristin Smith is a plaintiff in the pending *Wagner I* and *Wagner II* lawsuit against Defendant Harris County. On April 27, 2022, Defendant Harris County booked Smith into its jail facility. According to *Wanger II*, Smith entered the Jail with diabetes and blood pressure problems, which required regular doses of insulin and blood pressure medication respectively. *Id*. *10-11. Defendant Harris County's jail, however, did not provide Smith with her medications on a timely basis, and sometimes did not provide them at all. *Id*., 11. Other detainees eventually found her unresponsive in her cell. *Id*. She later died from diabetes-related complications, which resulted from the Jail's failures to provide her medication. *Id*. From this incident too, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

51

j.   **Benjamin Pierce**.  On May 20, 2022, Defendant Harris County booked Pierce into its jail facility.  Instead of receiving a full medical screening for any health issues upon entering the jail, Pierce was placed into a solitary cell.  Defendant Harris County was not properly monitoring and observing Pierce as it did not conduct face-to-face observations to determine if he was in need of medical attention upon being placed in that cell that lacked sufficient windows or cameras to observe him.  The next day, Defendant Harris County found Pierce unresponsive in his cell.  Hence, from this incident, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

k.   **Robert Wayne Fore**.  The common law wife and children of Fore are plaintiffs in the *Wagner I* and *Wagner II* case.  On May 21, 2022, Defendant Harris County booked Fore and placed him into a single cell.  Three (3) days later, on May 24, 2022, Defendant Harris County got around to conducting rounds and noticed a sheet tied around the mirror and around Fore's neck.  According to *Wagner II*, Fore's intake records had reflected that he had suicidal ideations and mental health issues, which required him to be classified as "at risk" and treated in a mental health facility.  *Id*., 11.  Instead, however, he was placed in a single cell and was not put on suicide watch.  *Id*.  Other detainees informed officers that Fore had threatened to hurt himself, including on the morning of his death.  *Id*.  Yet, he was still not placed on suicide watch, nor did officers adequately monitor him under county policies.  *Id*.  He eventually hung himself in his cell and was declared deceased.  *Id*.  Hence, from this incident, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

l.   **Loron Ernest Fisher**.  Fisher had a serious medical condition known as sickle cell disease.  On June 15, 2022, Fisher was in his cell and became in need of medical attention.  Defendant Harris County, however, was not properly monitoring and observing Fisher as they did not observe him needing medical attention and were only made aware of his condition by other detainees.  Upon finally getting to Fisher, Defendant Harris County took Fisher to the clinic.  After three (3) hours in the clinic with only a portion of that including actual examination, Fisher was cleared and returned to his floor.  Instead of placing Fisher with other detainees to allow for better observation of Fisher, Defendant Harris County placed Fisher in a holding cell that lacked sufficient windows or cameras to observe him and he died there.  Defendant Harris County's failure to provide Fisher with medication and medical attention for his known medical needs including sickle cell and failure to provide sufficient examination, observation, and diagnostic testing when Fisher went to the clinic led to the deprivation of Fisher's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Fisher's death.  Hence, from this incident, the

52

continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

m.   **Nathan Henderson**.  Nathan Henderson is the son of *Wagner I* and *Wagner II* plaintiff Shannon Piro, and the father of three minor plaintiffs in that lawsuit as well.  According to *Wagner II*,  immediately prior to being brought to the Jail, Henderson was in the hospital with a stab wound to the abdomen, which had become infected.  *Id*., 9.  Although he was still being treated for the infection and had not been cleared to leave the hospital, he was transferred to the Jail and placed in a single cell.  *Id*.  While Henderson was prescribed antibiotics for the infection, the jail regularly failed to provide him with his medication.  *Id*.  A week after being transferred to the Jail, Henderson died as a result of the infection and the Jail's failure to treat it.  *Id*.  Hence, as with Thompson's incident, Defendant Harris County's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care and systematic understaffing and overcrowding of the jail were the direct cause and moving force of Henderson's injuries.  *Id*., ¶ 110.  In other words, this incident also shows the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff.

n.   **Jim Franklin Lagrone**.   On July 26, 2022, Defendant Harris County booked Lagrone into its jail facility.  On July 26, 2022, Defendant Harris County booked Lagrone into its jail facility.  At the time, Defendant Harris County knew that Lagrone had a history of drug usage and was booked for possession of drugs.  Despite this known history, Defendant Harris County failed to further screen Lagrone for medical conditions and additional treatment while in the jail.  Before four (4) a.m. on July 31, 2022, Lagrone vomited into his toilet.  Defendant Harris County saw it but did not provide any medical care or additional monitoring.  A few hours later, Lagrone died.  Defendant Harris County's failure to properly observe and monitor Lagrone and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Lagrone's death.   The failure to provide Lagrone with medication and medical attention for his known medical needs including potential drug overdose led to the deprivation of Lagrone's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Lagrone's death.  Hence, from this incident, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

o.   **Damien Lavon Johnson**.  On July 27, 2022, Defendant Harris County booked Johnson into its jail facility.  On November 13, 2022, Johnson was left unobserved and unmonitored by jail staff for a significant and unreasonable period of time.  During which time, Johnson tied a sheet in his cell, placed it around his neck, and hung himself.  Defendant Harris County

53

then delayed in providing him with medical care, and on November 15, 2022, Johnson was declared dead. With actual proper face-to-face observations, Defendant Harris County would have observed Johnson attempt to use the sheet or seen him hanging with sufficient time to render aid or medical attention which would have prevented his death. Hence, from this incident, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

p. **Arlen Ashley Bates**. On June 20, 2022, Bates was arrested for possession of a controlled substance and was transported to Memorial Herman Southwest Hospital. After which, three (3) days later on June 22, 2023, Bates was booked into Defendant's Harris County Jail where Defendant Harris County's Sheriff's Office deputies assumed care, custody, and control. Two (2) days later, Bates died. Upon information and belief, Defendant Harris County failed to follow proper medical care instructions, provide medications, and conduct proper/timely face-to-face observations. So too did Defendant Harris County's understaffing and overcrowding of the jail impede Bates access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Bates' death as there was insufficient staff to handle the necessary functions of the jail let alone monitor the thousands of inmates even with the minimum required number of officers. Hence, from this incident, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred.

q. **Bernard Lockhart.** Bernard Lockhart is a plaintiff in the pending *Wagner I* and *Wagner II* case against Defendant Harris County. On June 28, 2022, Defendant Harris County booked Bernard Lockhart into its jail. According to *Wagner II*, on that day, an officer grabbed Lockhart's arm, wrenched it behind his back, and slammed his face against the wall. *Id.*, 16. He then dragged Lockhart into a holding cell. *Id.* Thereafter, additional officers come into the cell and began beating Lockhart. *Id.* He sustained several injuries including a torn rotator cuff. The Jail thereafter refused to provide him adequate medical treatment, and he could not obtain the necessary surgery to repair his torn rotator cuff until he was released from the Jail almost a year later. This incident too shows Defendant Harris County's continued and unchanged deliberated indifferent disposition.

r. **James Earl Gamble**. On August 26, 2021, Defendant Harris County booked Gambel into its jail facility. While in jail, Gamble did not receive medical screenings, care or medication for his serious medical conditions including hypertension. On August 25, 2022, other detainees informed Defendant Harris County that Gamble was unresponsive in his bunk. Defendant Harris County had not properly observed him as unresponsive. After taking Gamble to the clinic, the Houston Fire Department was called and took him to LBJ Hospital where Gamble was declared deceased.

Defendant Harris County's failure to provide Gamble with medical attention for his known medical needs including hypertension led to the deprivation of Gamble's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Gamble's death. Hence, the continued and unchanged deliberate indifferent disposition of Defendant Harris County's Sheriff may be inferred from this incident.

s.    **Victoria Margaret Simon**.    On September 29, 2022, Defendant Harris County booked Simon into a single quarantine cell.   In which, she did not receive adequate medical care.   On October 2, 2022, Defendant Harris County finally got around to conducting a tuberculosis test, but found Simon unresponsive.    After being transported to the clinic, Simon was pronounced dead by the jail's doctor.  Defendant Harris County's failure to properly observe and monitor Simon and conduct face-to-face observations led to inadequate medical care being provided to her in a timely manner and ultimately caused Simon's death.   Defendant Harris County's rampant practice and policies of understaffing, overcrowding and failure to train/supervise impeded Simon's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Simon's death. As such, Defendant Harris County's Sheriff's continued and uncharged deliberately indifferent disposition may be inferred from this incident.

t.    **Robert Alfred Horn**.    On or around October 24, 2022, Defendant Harris County booked Horn into its jail facility.   Two (2) days later, during another booking process, the decent suffered a medical emergency while sitting in a chair.   Upon information and belief, Defendant Harris County had either previously failed to adequate screen Horn for any serious medical conditions or was aware that he had one but failed to provided adequate, timely and sufficient care.    Moreover, upon information and belief, following the medical emergency Defendant Harris County failed to timely provide medical care and Horn died as a result.   Hence, this incident also shows Defendant Harris County's continued and unchanged deliberate indifferent disposition.

u.    **Taylor Euell (First Incidents)**.  Taylor Euell is a plaintiff in the *Wagner I* and *Wagner II* cases.   *Id*., 20-21.   On September 28, 2022, Defendant booked Euell into its jail facility.   As Euell was waiting in line to be processed, an officer abruptly and violently with overwhelming force grabbed a bag containing Euell's paperwork from him.  *Id*., *20.   When Euell asked for it back, the officer slammed Euell's face against the wall, injuring Euell's eye.  *Id*.   He also broke Euell's hand in the process of placing handcuffs on him.  *Id*.   When Euell attempted to obtain medical treatment for his injuries, the officer threatened to assault him if he told anyone about what had happened.  *Id*.   The clinic thereafter did not properly treat Euell's broken hand, causing the bone to grow back improperly.  *Id*. Separately, Euell had entered the Jail with known medical conditions that

55

required regular medications to prevent seizures but was constantly denied those medications. *Id.* \*20-21. Over the next several weeks and months, Euell's vision began to blur, prompting him to tell his wife that he had submitted to the Defendant several requests for medical attention but that the only attention he ever received after several weeks was a short evaluation by a general doctor and not an eye doctor. During this time, Defendant Harris County had also failed to provide Euell with his seizure medications consistently if at all. Moreover, Euell would go to the clinic several times with dangerously high blood pressure, only for Defendant Harris County to keep taking readings until a normal one was obtained rather than actually providing Euell with medications or to properly treat it. Defendant Harris County 's failure to provide him with his medications led to a breakthrough seizure on or around January 27, 2023. This seizure would not have occurred had Euell received his medications consistently. And, during it, rather than providing Euell with medical care, Defendant Harris County's jailers stomped on Euell's wrists and ankles. In all, this incident also shows Defendant Harris County's continued and unchanged deliberately indifferent disposition.

v.  **Alan Christopher Kerber**. On October 9, 2022, Defendant Harris County booked Kerber into a single quarantine cell which lacked proper observation and monitoring. Three (3) days later, Defendant Harris County eventually found Kerber unresponsive with a tube of toothpaste stuck in his throat. After which, Defendant Harris County delayed in providing medical care. Moreover, Defendant Harris County had also left Kerber unmonitored for a significant period of time. If Defendant Harris County had, however, properly observed and monitored Kerber, Defendant Harris County would have seen him attempting to harm himself and/or seen him become unresponsive within enough time to render aid that would have prevented his death. Defendant Harris County's failure to properly observe and monitor Kerber and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Kerber's death. Hence, this incident too shows Defendant Harris County's continued and unchanged deliberately indifferent disposition.

w.  **Dylan Perio**. Dylan Perio is a plaintiff in the *Wagner I* and *Wagner II* case against Defendant Harris County. *Id.*, 22. In or around November 2022, Defendant booked Perio into its jail facility. According to *Wagner II*, at that time, he reported to officers that he had HIV and required regular medication. *Id.* Defendant Harris County, however, denied him access to medication for almost a year, causing a relapse in his condition. *Id.* Perio's numerous requests for medical attention related his HIV symptoms were ignored, as were his subsequent complaints that prison officials were failing to provide him with medical attention. *Id.* Eventually, a medic at the Jail informed Perio that his organs were beginning to shut down because he was

not getting proper medication, placing him at risk of death. *Id.* Although the Jail's medical staff intervened at that juncture, Perio must live with the irreversible denial of medication and treatment. *Id.* Hence, this incident shows Defendant Harris County's continued and unchanged deliberately indifferent disposition.

x. **Michael Griego**. Michael Griego's mother Judith Jones is a plaintiff in the pending *Wagner I* and *Wagner II* case against Defendant Harris County. On November 13, 2022, numerous detainees in Defendant's custody attacked Griego while Defendant watched. According to *Wagner II*, although officers observed the incident, they did not interfere or provide aid until after the beating had stopped and Griego was unconscious. *Id.*, 12. As a result of the beating and the officer's lack of intervention, Griego sustained severe head trauma that subsequently led to his death. In other words, this incident too shows Defendant Harris County's continued and unchanged deliberately indifferent disposition.

y. **William Curtis Barrett**. William Curtis Barrett's sister, heir and representative is a plaintiff in the *Wagner I* and *Wagner II* case. On November 17, 2022, Defendant Harris County booked Barrett into its jail facility, and then became aware of Barrett's mental health issues for which he received medications. Defendant put Barrett into a single person cell despite his known mental health issues and the known damage that solitary confinement can have on the psychological disposition of detainee with his disability. At some point thereafter, according to *Wagner II*, Barrett was assaulted, resulting in significant head trauma and visible head wounds. *Id.*, 7. He was not provided with sufficient treatment or a medical evaluation related to his head wounds. *Id.* Despite his head injuries, the Jail failed to monitor him, and he was found unresponsive on his cell floor three days later. *Id.* He then died as a result of the blunt force trauma to his head. *Id.* In all, this incident too shows Defendant Harris County's continued and unchanged deliberately indifferent disposition.

z. **Adael Gonzalez Garcia**. In or around November 25, 2022, Garcia allegedly fell from his cell bunk and was taken to the jail for examination. Defendant Harris County, however, failed to conduct proper face-to-face or camera monitor, and as such, delayed in proving Garcia with medical care. Alternatively, "falling off of a bunk" is a common excuse created by guards and detainees for detainee's injuries to cover up for an officer's use of force and assault of an inmate. And, if that happened, upon information and belief, Defendant Harri County delayed in providing medical care to Garcia after it. After care was eventually provided, the next day on November 26, 2022, while being escorted back from the clinic, Defendant Harris County's guards assaulted Garcia and then failed to adequately provide him with immediate medical care. Garcia then went into a coma. Garcia, however, was never charged with assaulting an officer which is very unusual in Harris

County when an inmate is beaten by an officer. As of February 13, 2023, Garcia is still in the hospital with a coma. Hence, this incident too shows Defendant Harris County's Sheriff's continued and unchanged deliberately indifferent disposition.

aa.   **Harrell Veal**. Harrell Veal is a plaintiff in the pending *Wagner I* and *Wagner II* case against Defendant Harris County. *Id*., 15-16. A few months after January 23, 2022 but before December 24, 2022, Defendant Harris County failed to and delayed to provide Veal with his blood pressure medications which were prescribed to him to help him control a serious medical condition known as high blood pressure. Separately, according to *Wagner II*, Veal was attacked from behind by unknown assailants who punched and kicked Veal numerous times in the back, chest, and head. *Id*., 16. As a result, Veal sustained broken ribs, a bruised back, and numerous broken bones in and around his head which required him to have a mental plate installed in his head and undergo an eye socket reconstruction procedure. *Id*. During another incident, Veal was being escorted in handcuffs by an officer, and once out of view of security cameras, the officer forced Veal's arms and hands into a contorted position and applied pressure excessively injuring Veal's wrists, shoulders, and back. *Id*., *15-16. As such, this incident too demonstrates Defendant Harris County's Sheriffs continued and unchanged deliberately indifferent disposition.

bb.   **Jacoby Pillow**. Jacoby Pillow's sister, heir, and representative, Octavia Wagner, is the namesake plaintiff in the *Wagner I* and *Wagner II* case against Defendant Harris County. On January 1, 2023, Defendant Harris County took custody of Pillow following a misdemeanor charge. According to *Wagner II*, right before Pillow was set to be released on bond, he was involved in an altercation with officers at the Jail. Which culminated in multiple officers beating Pillow. *Id*., *4-5. Several officers placed their weight onto Pillow's chest and back, which prevented him from breathing while they assaulted him. *Id*., *5. This incident caused Pillow to sustain blunt force trauma to his head, back and extremities. *Id*. Despite the severe injuries the Jail cleared him to return to his holding cell, where he was later found unresponsive. *Id*. Jail staff did not check on Pillow for several hours while he was in the holding cell. *Id*. He died shortly thereafter, and an autopsy found that his death was caused by the compression and blunt force trauma he sustained during the assault. *Id*. As such, this incident too shows Defendant Harris County's Sheriff's continued and unchanged deliberately indifferent disposition.

cc.   **Gary Wayne Smith**. Gary Wayne Smith is the father of Gabrielle Smith and other minors who are Plaintiffs in the pending *Wagner I* and *Wagner II* lawsuit against Defendant Harris County. On December 6, 2022, Defendant booked Smith into its jail facility. According to *Wagner II*, Smith entered the Jail with a kidney disorder that required medication, consistent

58

treatment, and continuous observation. *Id*., 10. He was placed in a cell that did not allow for such observation. *Id.* During his short detention at the Jail, he was transported to the hospital numerous times related to this kidney condition. *Id*. However, he still did not receive the medication or constant monitoring that his condition required. *Id*. As such, this incident too shows Defendant Harris County's Sherriff's unchanged and continued deliberately indifferent disposition.

dd.    **Kevin Leon Smith, Jr.**  Keving Smith's father and mother are plaintiffs in the pending *Wagner I* and *Wagner II* case against Defendant Harris County. On July 1, 2022, Defendant booked Smith into its jail facility with known serious medical conditions. According to *Wagner II*, several months later, he suffered a medical emergency in his cell. *Id*., *7-8. Due to the lack of monitoring, other detainees had to notify Jail staff of the incident. *Id*., *8. Despite the gravity of the situation, clinic staff stood around joking about an unrelated topic for several minutes instead of responding to the incident in a timely fashion. *Id*. When they reached Smith's pod, they encountered five (5) to six (6) officers idly standing around Smith's bunk. *Id*. Although Smith was unresponsive, the officers did not provide CPR or other emergency life saving measures because they thought he was faking his medical emergency. *Id*. Smith was eventually placed on a blackboard and brought to the clinic, an officer finally began chest compressions but refused to let anyone give mouth-to-mouth breaths or provide a breathing apparatus. *Id*. At the clinic, an AED was retrieved, but could not be used because it had not been charged. *Id*. The clinic, which serves the entire Jail, had only one AED. *Id*. Smith was declared dead later that day. *Id*. The clinic subsequently falsified records as to when lifesaving measures began. *Id*. As such, this incident too shows Defendant Harris County's Sherriff's unchanged and continued deliberately indifferent disposition.

ee.    **John Maxey**.  Defendant Harris County had Maxey in its custody at its jail facility. Upon information and belief, Defendant Harris County denied Maxey proper adequate, sufficient, and timely medical care for a serious medical condition, colon cancer, and Maxey died as a result in or around November 2022. Hence, this incident too shows Defendant Harris County's Sheriff's continued and unchanged deliberately indifferent disposition.

ff.    **Jeremiah Anglin**.  Jeremiah Anglin is a plaintiff in the pending *Wagner I* and *Wagner II* case against Defendant Harris County. On November 28, 2022, Defendant booked Anglin and was aware of his serious medical and mental condition (i.e., schizophrenia). Despite that, according to *Wagner II*, Anglin was placed in the general population instead of the mental health ward. *Id.*, 14-15. Like others, he appears to have been denied regular medication for his condition. *Id.*, 15. While at the Jail, he was handcuffed and beaten by officers. *Id*. Due to this assault, he lost six (6) teeth, endured significant health swelling, and had to have multiple screws placed in his

59

mouth to repair the damage.  As such, this incident too shows Defendant Harris County's continued and unchanged deliberately indifferent disposition.

gg.   **John Coote**.  John Coote is a plaintiff in the pending *Wagner I* and *Wagner II* lawsuit against Defendant Harris County.   On February 1, 2023, Defendant booked Coote into its jail facility.  *Id.*, Pg. 33 ¶ 178.  On February 7, 2023, Defendant viciously beat Coote to the ground in an area (i.e., the vestibule) known to not have cameras.  *Id.* ¶ 180-181.  According to *Wagner II*, there, multiple officers sprayed him with pepper spray, wrestled him to the ground, and assaulted him.  *Id.,* 16.  He was then taken to the clinic for his injuries, where the escorting officers falsely told the clinician that Coote was injured by another detainee.   *Id.*   At the clinic, Coote received substandard care for his facial bruising, broken nose, difficulty breathing, and memory loss.  *Id.*  Coote was later assaulted twice by different groups of detainees, resulting in a broken foot, a broken nose, a bruised shoulder, a swollen face, and brain trauma.  *Id.*  Officers failed to intervene in either incident.   *Id.*   Coote was subsequently involved in an altercation with officers in which the officers slammed Coote against a concrete wall and floor before punching him nay times.  *Id.*  Hence, this incident too shows Defendant Harris County's continued and unchanged deliberately indifferent disposition.

hh.   **Christopher Young**.  Christopher Young is a plaintiff in the pending *Wagner I* and *Wagner II* lawsuit against Defendant Harris County.   On February 11, 2023, detainee Young walked into the bathroom, and several minutes to a few hours later, a detainee informed Defendant that Young was in the bathroom with head split open.  According to *Wagner II*, Young "fell" while in the bathroom and it is common practice in the Jail to report assaults at the hands of detainees or officers as "falls" in order to avoid retribution.  *Id.*, *22.  The assault caused severe facial fractures, a lacerated ear, and loss of vision in one eye, and Young was subsequently hospitalized for almost a month.  *Id.* *22.  Hence, this incident too shows Defendant Harris County's Sheriff's continued and unchanged deliberately indifferent disposition.

ii.   **Jaquez Moore (First Incidents)**.  Jaquez Moore is a plaintiff in the pending *Wagner I* and *Wagner II* lawsuit against Defendant Harris County.   In November 2022, Defendant booked Moore into its jail facility, and obtained notice that Moore had a history of seizures due to a brain injury and also had epilepsy.  According to *Wagner II*, as the Jail was aware, Moore takes medication to control his seizures.   *Id.*, 19.   The Jail, however, often withheld medication from him as punishment.  *Id.*  On February 13, 2023, Defendant allowed Moore to be attacked by other detainees.   Moore was left lying on the floor for roughly thirty (30) minutes before Jail staff responded to the incident.  *Id.*  Instead of taking him to the clinic, Moore was placed in a holding cell streaked with feces.  *Id.*  He was eventually

taken to the clinic, where he was placed in a different holding cell for over eight (8) hours. *Id*. In lieu of testing or evaluation of his injuries, he received a drink to restore his electrolytes and a small amount of pain medicine. *Id*. *19-20. Hence, this incident too also shows Defendant Harris County Sheriffs' continued and unchanged deliberately indifferent disposition.

jj. **Taylor Euell (Second Incidents)**. As previously mentioned, Taylor Euell is a plaintiff in the *Wagner I* and *Wagner II* cases. *Id*., 20-21. On or around February 2, 2023, Euell reported to Defendant Harris County that other detainees had threatened to sexually assault him. According to *Wagner II*, the officers ignored this report and chose to not transfer him to a different unit, conduct additional observations, or otherwise attempt to prevent the assault. *Id*., 21. The other inmate did eventually try to sexually assault Euell. *Id*. Euell attempted to defend himself, resulting in a physical altercation where Euell walked away with a broken nose and impaired vision in his good eye. *Id*. Euell received no medical treatment for these injuries. *Id*. His nose has healed improperly, causing a visible deformity. *Id*. Hence, this incident too shows Defendant Harris County Sherriff's continued and unchanged deliberately indifferent disposition.

kk. **Fabien Cortez**. On March 21, 2023, Defendant Harris County processed Cortez into its jail facility, and allowed him to go to the restroom. In accordance with Defendant's customs, policies, and practices, Defendant failed to observe, monitor, or conduct face-to-face observations with Cortez for at least eighty-eight (88) minutes. In the restroom, Cortez became in need of medical attention, but Defendant failed to provide it. On April 17, 2023, the Texas Commission on Jail Standards, as laid out below, found that Defendant had violated minimum jail standards by failing to conduct face-to-face observations with Cortez for over eighty-eight (88) minutes. This led to a severe constitutional violation as Cortez was given more than enough time to hang himself, and the lapse in time prevented timely medical care. Defendant Harris County's failure to properly observe and monitor Cortez and conduct face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Cortez's death. Hence, this incident too shows Defendant Harris County Sheriff's unchanged and continued deliberately indifferent disposition.

ll. **Jeremy Garrison**. Garrison is a plaintiff in the pending *Wagner I* and *Wagner II* lawsuit against Defendant Harris County. *Id*., 12-13. On or around April 23, 2023, Defendant viciously beat Garrison up, and upon information and belief delay or failed to provide him with adequate and sufficient medical care afterwards. According to *Wagner II*, although Garrison reported the incident, he received no update on the Jail's investigation, nor does it appear that any disciplinary actions were taken against the officers. *Id.*, 12. Instead, about a month later, on May 20, 2023,

he was again pepper sprayed and beaten by several officers in the dayroom after Garrison asked to speak with the officers' sergeant. *Id.* This beating resulted in a "Hangman's fracture" to his neck, which required immediate surgery. *Id.* Garrison's treating physician remarked that he was lucky not to have been paralyzed given the severity of his neck trauma. *Id.* Aside from his neck injury, Garrison suffered extreme bruising, head trauma, lacerations to multiple areas of his body, loss of consciousness, visual changes, and loss of strength in and use of his right hand. *Id.* Immediately after the beating, officers attempted to conceal evidence from the incident. *Id.*, \*12-13  Instead of taking pictures or otherwise documenting the blood on the floors and walls of the dayroom, they immediately cleaned the space, destroying evidence of the incident. *Id.*, \*13.  Several detainees attempted to provide witness statements, but officers refused to take their statements. *Id.* Hence, this incident too shows Defendant Harris County's Sheriff's continued and unchanged deliberately indifferent disposition.

mm.   **Kenneth Richard**.  Richard is a plaintiff in the pending *Wagner I* and *Wagner II* case against Defendant Harris County.  *Id.*, \*13-14.  On April 22, 2023, Defendant booked Richard into its jail facility, and had notice that Richard had a serious medical condition known as anxiety for which he was taking medication.  According to *Wagner II*, Defendant Harris County failed to provide Richard with his medication on a regular basis.  *Id.*, \*14  He complained to his mother over the Jail phone of the poor jail conditions. *Id.*  During a visit to the clinic, officers placed Richard in handcuffs and leg shackles, which they had not done during prior visits.  *Id.*  Two officers then escorted Richard, as they had with Thompson, to a well-known location where officer beatings frequently occur.  *Id.*  There, the officers told Richard not to complain to his mother anymore.  *Id.*  Four additional officers arrived in the cell, and they began to beat Richard, who was still shackled.  *Id.*  After Richard fell to the ground, they stomped and kicked him.  *Id.*  Unconscious, Richard was transported to the hospital with severe head injuries, injuries to his back and chest, blurred vision, memory loss, numbness in his extremities, and loss of skin around his wrists and ankles.  *Id.*  His injuries were so severe that he had to be intubated during treatment.  *Id.*  Hence, this incident too shows Defendant Harris County's Sheriffs' continued and unchanged deliberately indifferent disposition.

nn.   **Jaquez Moore (Second Incidents)**.  As previously pled, Jaquez Moore is a plaintiff in the pending *Wagner I* and *Wagner II* lawsuit against Defendant Harris County.  In May 2023, Defendant Harris County allowed Moore to be attacked while he was walking back from the commissary.  According to *Wagner II*, several officers waited around of the assault to be over before intervening as was the custom.  *Id.*, 20.  As a result, Moore acquired injuries to his head and eye, and now endures partial memory loss.  *Id.*   Some of these injuries went untreated for weeks, as the medical kiosk on this floor was broken indefinitely and the officers routinely ignored his requests for

treatment.  *Id*.  Hence, this incident too shows Defendant Harris County's Sheriffs' continued and unchanged deliberately indifferent disposition.

oo.   **Robert Terry, Jr.**  On May 13, 2023, Defendant Harris County booked Terry into its jail facility.  On May 16, 2023, Terry pressed the intercom button in a multi-occupancy cell, fell to the floor clutching his stomach, began to foam at the mouth, and tried crawling to the dayroom.  Defendant Harris County, however, failed to notice Terry's initial need for medical attention, and it took ninety (90) minutes for medical personnel to arrive during which time the jailers stood around, laughed and taunted Terry.  Terry then passed away later that morning.  Hence, this incident too shows Defendant Harris County Sheriffs' continued and unchanged deliberately indifferent disposition.

pp.   **Antonio Radcliff**.  Antonio Raadcliff is a plaintiff in the pending *Wagner I* and *Wagner II* lawsuit against Defendant Harris County.  On March 7, 2023, Defendant booked Radcliffe into its jail, and he was a trustee tasked with serving meals in other area of the jail.  On or around May 18, 2023, Radcliffe was serving food with two other detention officers when another detainee came and attacked Radcliffe.  According to *Wagner II*, Defendant Harris County's officers did not interfere with the assault or attempt to prevent it.  *Id*., 18.  After the assault, Radcliff complained of head pain and a possibly broken jaw, but the Jail clinic force him to return to work serving detainees food.  *Id*.  He was eventually taken to the hospital, where he underwent surgery that involved installing several metal plates around his jaw.  *Id*.  Hence, this incident too shows Defendant Harris County Sheriff's continued and unchanged deliberately indifferent disposition.

qq.   **Zachery Johnson**.  Zachery Johnson is a plaintiff in the pending *Wagner I* and *Wagner II* case.  On or around May 29, 2023, Defendant Harris County booked Johnson into its jail facility.  On or around June 6, 2023, another detainee attacked Johnson and caused him to have a red eye another bruising on his body.  According to *Wagner II*, Defendant Harris County's officers did not interfere with the attack or otherwise prevent it.  *Id*., 13.  A few days later, Johnson was assaulted by several officers, which caused him to lose consciousness multiple times.  *Id*.  Johnson subsequently suffered from seizures, of which he had no prior history.  *Id*.  The officers' beating also left him with a brain bleed and a fractured skull, neck, spine, and ribs.  *Id*.  Despite these extensive and painful injuries, the Jail clinic failed to provide sufficient treatment after either event.  *Id*.  Johnson did not receive adequate medical care for these life-threatening injuries until he was released from the Jail some days later.  *Id*.  Hence, this incident too shows Defendant Harris County's continued and unchanged deliberately indifferent disposition.

63

rr. **Zachary Zepeda**.  Zachary Zepeda is a plaintiff in the pending *Wagner I* and *Wagner II* case.  On June 6, 2023, Defendant Harris County booked Zepeda into its jail facility, and at the time obtained notice that he had a serious medical condition which included anxiety.  According to *Wagner II*, Zepeda was attacked by other detainees.  *Id.*, 19.  Defendant Harris County's officers did not intervene in the assault.  *Id.*  He was brought to the hospital with skull fractures, brain and spine bleeds, facial bruising, a broken eye socket, and a spinal compression fracture.  *Id.*  When his mother later visited him at the Jail, she reported seeing one of the guards drag Zepeda by his leg across the room, despite the fact that Zepeda's severe injuries were still healing.  Hence, this incident too shows Defendant Harris County's Sheriffs continued and unchanged deliberately indifferent disposition.

ss. **Ramon Thomas**.  Ramon Thomas' mother and heir, Dianne Bailey Rijsenburg, is a plaintiff in the pending *Wagner I* and *Wagner II* case.  On April 19, 2023, Defendant Harris County booked Ramon Thomas into its jail facility, and at the time obtained notice of his serious medical conditions which including being bipolar and schizophrenic.  Due to his mental state, Thomas was extremely vulnerable to bullying and abuse, and bullied to the point where Thomas' family requested that he be placed in the mental health section of the jail.  Despite assurances that Thomas would be placed in a safe part of the jail, Defendant placed Thomas in the general population of a certain floor, a floor where several other Plaintiffs were injured or lost their lives.  Although Thomas's mental disability required continuous observation and care to ensure his safety Defendant placed him on the sixth floor with lacked measures to provide sufficient observation and monitoring.  On July 1, 2023, Ramon Thomas suffered from a medical emergency.  According to *Wagner II*, Thomas was found by other detainees on the floor of his cell suffering from a medical emergency.  *Id.*, 9.  The detainees called for help for several minutes with no response from the officers.  *Id.*  When officers did respond, they failed to conduct CPR or other lifesaving measures.  *Id.*  The clinic staff falsified records describing when life saving measures began.  *Id.*  Thomas was eventually taken to the hospital where he died from blunt force trauma and asphyxiation, presumably caused by another detainee.  *Id.*  Hence, this incident too shows Defendant Harris County's Sheriff's continued and unchanged deliberately indifferent disposition.

tt. **Bryan Johnson**.  Bryan Johnson's mother and heir, Amanda Harris, is a plaintiff in the pending *Wagner I* and *Wagner II* case.  On June 8, 2022, Defendant Harris County booked Johnson into its jail facility, and at the time obtained notice of his serious medical and mental disabilities. On or around August 5, 2023, Defendant Harris County asked Johnson to leave his cell so that they could investigate a potential fight between detainees. According to *Wagner II*, as he was exiting the cell, the officers pushed

Johnson, causing him to stumble. *Id.*, *5. The officers then tackled Johnson to the ground and beat him for several minutes before placing him in restraints. *Id.* Afterwards, the officers did not take him to the Jail's clinic, instead, they placed him in a holding cell. *Id.*, *5-6. They returned several hours later and again beat Johnson. *Id.*, *6. Despite sustaining injuries to his wrists and right left as well as facial bruising, Johnson was not taken to the clinic until several days later, at which time the clinic completed a cursory examination of him. *Id.* Following the incident, Bryan Johnson had difficulty breathing, and he was eventually prescribed an inhaler. *Id.* Officers confiscated his inhaler, denying him access to his prescribed treatment. *Id.* Johnson died several weeks later after the injuries inflicted by the officers caused complications with his existing heart and lung conditions. *Id.* In the week before his death, he reported difficulty breathing and requested medical attention, but the Jail ignored his requests and failed to treat his condition. *Id.* These incidents related to Bryan Johnson also demonstrate Defendant Harris County Sherriff's continued and unchanged deliberate indifference.

uu. **Alfred Rios**. Rios had been in Defendant Harris County's custody since at least March 2021 which amounts to approximately two (2) year for only a mere misdemeanor charge. In or around September 2023, Rios had a medical emergency while in Defendant Harris County's custody at its jail. Upon information and belief, Defendant Harris County failed to properly monitor its detainees and conduct proper face-to-face observations. As such, Defendant Harris County unreasonably delayed in providing Rios with timely, sufficient, and adequate medical care. Hence, this incident too shows Defendant Harris County's continued and unchanged deliberately indifferent disposition.

vv. **Kenneth McZeal**. McZeal had been in Defendant Harris County's custody since June 8, 2021. During his stay, Defendant Harris County knew that McZeal had a terminal illness. Yet, upon information and belief, Defendant Harris County failed to provide timely and adequate medical care to McZeal during his stay in Defendant Harris County's jail facility. Upon information and belief, Defendant Harris County failed to properly monitor its detainees and conduct proper face-to-face observations. As such, Defendant Harris County unreasonably delayed in providing McZeal with timely, sufficient, and adequate medical care. As a result, on or around October 9, 2023, McZeal died. Given so, this incident too shows Defendant Harris County's Sheriff's continued and unchanged deliberately indifferent disposition.

ww. **Dequon Buford**. Dequon Buford is the son of *Wagner I* plaintiff-intervenor Chandra Jenkins. On June 12, 2023, Dequon Buford was placed into Defendant Harris County's custody, and at that time, Defendant Harris County had notice of his schizophrenia, anemia, iron deficiency, anxiety, and bipolar 1 disorder. Upon information and belief, Defendant Harris

65

County denied him medical care for those serious medical needs, and on or around September 25, 2023, placed him in general population from Division 5. According to *Wagner I*, Buford was repeatedly sexually assaulted by fellow inmates and denied medical while detained in the jail. *Id*., \*11. As such, this incident too shows Defendant Harris County's Sheriff's continued and unchanged deliberately indifferent disposition.

xx. **Dominga Treviño Barrera**. Defendant Harris County booked Barrera into its jail facility and was awaiting trial since June 29, 2023. Before that, she was arrested at a hospital while she was receiving treatment for a serious medical condition. Upon her booking, Defendant knew that she had serious medical and mental health conditions. Defendant Harris County, however, failed to adequately provide Barrea with the medication attention that she required. Moreover, upon information and belief, Defendant Harris County failed to properly monitor its detainees and conduct proper face-to-face observations. As such, Defendant Harris County unreasonably delayed in providing Barrera with timely, sufficient, and adequate medical care. As a result, on October 27, 2023, Barrera died. This incident too demonstrates Defendant Harris County's continued and uncharged deliberate indifferent disposition.

yy. **Tramell Morelle**. Tramell Morelle is a plaintiff in the pending *Wagner I* and *Wagner II* case against Defendant Harris County. ON July 28, 2023, Tramell Morelle was booked into the Harris County jail, and suffered an injury on July 30, 2023. According to *Wagner II*, Morelle was beaten by seven other detainees. *Id*., \*16. Officers stood by and watched the fight but did not intervene in any way. *Id*., 16-17. Morelle sustained a broken jaw from the assault which required surgery and the installation of two metal plates to hold his jaw in place. *Id*. \*17. This incident too demonstrates Defendant Harris County's continued and uncharged deliberate indifferent disposition.

zz. **John Raymond Hackl**. A decedent of John Raymond Hackl, named Cambrey Lindsay, has recently sought to intervene as a plaintiff into the *Wagner I* and *Wagner II* case. On May 24, 2024, Hackl was found unresponsive on the floor of his cell, where he remained for one to two hours before jail staff even bothered to respond. As a result, Hackl was left in a vegetative state and thereafter died shortly after the issuance of a PR bond issued to avoid having to report yet another in custody death. Hence, this incident too shows Defendant Harris County's continued and unchanged deliberately indifferent disposition.

### COUNT 4 – FAILURE TO TRAIN
*(Against Defendant Harris County)*

66

81.     Thompson incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

82.     A county can be held liable when its failure to adequately train officers results in violations of constitutional rights.  *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *133-134 (S.D. Tex. 2018).  To establish such a failure to train claim, a plaintiff need only show that (1) the county failed to train the officers involved, (2) there is a causal connection between the alleged failure to train and the alleged violation of the plaintiff's rights, and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.  *Id*. at *134.

83.     Here, Defendant Harris County failed to train its officers on many levels.  First, Defendant Harris County failed to train its supervisors with regards to the minimum standards for running a jail.  Among those include training its supervisory officials regarding the requirement to have an appropriate number of jailers at the facility twenty-four (24) hours each day, how many jailers were required on each floor at all times, and to have an established procedure for documented, face-to-face observation of all inmates by jailers no less than once every sixty (60) minutes.  Moreover, Defendant Harris County failed to train its guards in how to properly conduct and document face-to-face observations of all inmates, to identify when pre-trial detainees had serious medical needs that required attention, and how to conduct contraband searches to ensure that drugs would not enter the facility without authorization.  Second, Defendant Harris County also failed to train its licensed physicians, professionals, allied health personnel, hospital, or similar services in the minimum requirements for a jail in Texas.  Among those included the need for how to provide referrals, procedures for efficient and prompt care for acute and emergency situations, procedures for all examinations, treatments and other procedures to be provided in a dignified manner, how to use first aid equipment, properly evaluate patients, and how to provide inmates

67

with access to medical care.  Third, there a total and complete failure to train Defendant Ortega and Vickers.  Upon information and belief, these individuals had no training whatsoever.

84.   Additionally, there is a causal connection between those failures-to-train and the violation of Thompson's civil and constitutional rights.  Again, as an initial matter, Thompson had the right to be free from the use of excessive force.  *Castro v. Kory*, 2024 U.S. App. LEXIS 8805 *11-12 (5th Cir. 2024).  Moreover, Thompson also had pre-trial detainee rights under the Due Process Clause of the Fourteenth Amendment to receive provision of "basic human needs, including medical care and protection from harm" met.  *Wynn v. Harris Cty.*, 556 F. Supp. 3d 645, 655 (S.D. Tex. 2021) (Ellison, K.).  As explained further elsewhere in this petition, when the government takes a person into custody and holds him there against his will, the U.S. Constitution imposes upon the government corresponding duties to assume some responsibility for his safety and general well-being.  *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

85.   First, Defendant Harris County failure to train its supervisors with regards to the minimum standards for running a jail resulted in a poorly run jail that harmed Thompson.  Since supervisory officials were not trained on the requirement to have an appropriate number of jailers at the facility twenty-four (24) hours each day, how many jailers were required on each floor at all times, and to have an established procedure for documented, face-to-face observation of all inmates by jailers no less than once every sixty (60) minutes, Thompson was viciously beat by jailers in a blind spot and then denied medical care.  Moreover, since Defendant Harris County failed to train its guards in how to properly conduct and document face-to-face observations of all inmates and how to identify when pre-trial detainees had serious medical needs that required attention, Thompson sat in his cell for days without medical care. Second, given Defendant Harris County failure to train its licensed physicians, professionals, allied health personnel, hospital, or

similar services in the minimum requirements for a jail in Texas, Thompson was further denied proper medical care. Third, there a total and complete failure to train Defendant Ortega and Vickers.  Upon information and belief, these individuals had no training whatsoever, and this resulted in Thompson's several injuries.

86.    Furthermore, all of this constituted a deliberate indifference in two ways; to wit:  1) the Defendant was repeatedly put on notice of the same constitutional violations in the jail through DOJ Reports, TCJS Reports, lawsuits, settlements, and public discussion showing that its own policymakers (*i.e*., its Sheriff and others) were on notice of these problems, yet failed to act or properly address the continued violations; 2) there is a clear pattern of similar incidents here, established in the historical record.  It is well known that for purposes of failure-to-train claims, a showing of deliberate indifference would require only "a pattern of *similar* constitutional violations by untrained employees, rather than exact duplication." *Parker v. LeBlanc*, 73 F.4th 400, 406 (5th Cir. 2023) (internal quotations omitted).  Here, first, Defendant Harris County was repeatedly put on notice of the same or similar constitutional violations, and second there is a pattern of similar constitutional violations which show deliberate indifference.

87.    Out of abundance of caution, and for purposes of brevity, the Plaintiff hereby adopts by reference the facts and statements contained in the pleadings of the *Wagner v. Harris Cnty*. case, mentioned above. Fed. R. Civ. P. 10(c). Alternatively, Plaintiff respectfully requests the Court to take judicial notice of said pleadings in said case.

**COUNT 5 – EXCESSIVE FORCE**
*(Against Defendants Ortega and Vickers)*

88.    Thompson incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

**A.    EXCESSIVE FORCE ELEMENTS**

89.     For an excessive force claim, a plaintiff need only show (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) excessiveness that was clearly unreasonable.  *Darden v. City of Fort Worth*, 800 F.3d 722, 727 (5th Cir.), cert denied, 139 S. Ct. 69 (2018).  First, Thompson suffered injury.  As long as a plaintiff has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force.  *Bagley v. Guillen*, 90 F.4th 799, 803 (5th Cir. 2024) (finding the same).  Here, however, Thompson suffered that and a fractured jaw.  Second and third, those injuries resulted directly and only from uses of force that was clearly excessive and the excessiveness was clearly unreasonable.

90.     Force against a pretrial detainee is excessive and a violation of the Fourteenth Amendment when the force was objective unreasonable.  *Kingsley v. Hendrickson*, 576 U.S. 389, 396-397 (2015).  The following factors bear on the reasonableness inquiry: (a) the relationship between the need for the use of force and the amount of force used, (b) the extent of plaintiff's injury, (c) any effort made by the officer to temper or to limit the amount of force, (d) the severity of the security problem at issue, (e) the threat reasonably perceived by the officer, and (f) whether the plaintiff was actively resisting.  *Id.*, 397.  Here, first, there was no need to take Thompson outside of his cell, place him in handcuffs and then use any force upon him.  Second, the extent of Thompson's injuries were served, his jaw was fractured, necessitating a metal plate.  Third, Defendant Ortega and Vickers made no effort whatsoever to temper or limit the amount of force used.  Fourth, there was no security problem because Thompson had been locked in his cell, and after that he was handcuffed.  Fifth,  Defendant Ortega and Vickers perceived no threat since they took Thompson to a known camera blind spot.  Sixth, Thompson was not actively resisting.

**B.      NO QUALIFIED IMMUNITY**

70

91.     Defendants are also not entitled to qualified immunity.  As an initial matter, this Honorable Court has previously noted that qualified immunity is a "good faith immunity." *Notzon v. City of Laredo*, 2018 U.S. Dist. LEXIS 117804 * 18 (S.D. Tex. 2018) (Hanen, A.) (denying motion to dismiss on qualified immunity grounds).  It is not intended to protect the plainly incompetent and those who knowingly violate the law. *Hughes v. Garcia*, 2024 U.S. App. LEXIS 10922 *13 (5th Cir. 2024) (denying qualified immunity).  It will not protect officers who apply excessive and unreasonable force merely because their ways of applying it are novel.  *Frank v. Parnell*, 2023 U.S. App. LEXIS 23893 *18 (5th Cir. 2023) (finding the same).  Rather, government officials are entitled to qualified immunity ***only if*** (1) the officer violated a federal statutory or constitutional right and (2) the unlawfulness of the conduct was clearly established at the time. *Hughes v. Garcia*, 2024 U.S. App. LEXIS 10922 *13-14 (5th Cir. 2024).

92.     Upon the first, a pretrial detainee, like the Plaintiff, receives the protections of Due Process Clause of the Fourteenth Amendment. *Austin v. City of Pasadena*, 74 F.4th 312, 322 (5th Cir. 2023) (observing the same).  Moreover, the Fourth Amendment enshrines the right to be free from excessive force. *Castro v. Kory*, 2024 U.S. App. LEXIS 8805 *11-12 (5th Cir. 2024) (denying qualified immunity on excessive force).  Force against a pretrial detainee is excessive and a violation of the Fourteenth Amendment when the force was objectively unreasonable.  *Austin v. City of Pasadena*, 74 F.4th 312, 322 (5th Cir. 2023) (observing the same).

93.     As to the second, the Fifth Circuit has repeatedly stated that its precedents can clearly establish the law.  *Walls v. Sheriff's Off. of Caddo Par.*, 2023 U.S. App. LEXIS 32241 *4 (5th Cir. 2023) (observing the same); *Boyd v. McNamara*, 74 F.4th 662, 670-71 (5th Cir. 2023) (same).  From those precedents, a plaintiff may demonstrate clearly established law by identifying a case or body of relevant case law in which the violation of the Constitution was found under

71

factually similar circumstances. *Lewis v. Inocencio*, 2024 U.S. App. LEXIS 1416 *10 (5ᵗʰ Cir. 2024) (finding excessive force claim survives). Here, at the time of the incident, it was well-established that officers may not use gratuitous force against a prisoner who has already been subdued or incapacitated. *Cowart v. Erwin*, 837 F.3d 444, 554 (5ᵗʰ Cir. 2016) (affirming excessive force jury verdict). Hence, Defendants Vickers and Ortega cannot possibly be entitled to qualified immunity for removing Thompson from his locked cell, handcuffing, and taking him to a known blind spot to excessive beat him with unreasonable force outside of the view of the cameras.

**COUNT 6 – FAILURE TO INTERVENE**
*(Against Defendants Ortega and Vickers)*

94.    Thompson incorporates the foregoing paragraphs as if set forth fully herein.

**A.    BYSTANDER LIABILITY ELEMENTS MET**

95.    A failure to intervene claim arises when an officer, who can prevent harm caused by a fellow officer's constitutional violations, fails to act. *Castro v. Kory*, 2024 U.S. App. LEXIS 8805 *13 (5ᵗʰ Cir. 2024) (finding failure to intervene claim survives); *Kitchen v. Dallas County*, 759 F.3d 468 (5ᵗʰ Cir. 2014). An officer who is present at the scene and does not take reasonable measures to protect a citizen from another officer's use of force may be liable under § 1983. *Hale v. Townley*, 45 F.3d 914, 919 (5ᵗʰ Cir. 1995). The elements include an officer (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act. *Austin v. City of Pasadena*, 74 F.4th 312, 331 (5ᵗʰ Cir. 2023); *Joseph v. Bartlett*, 981 F.3d 319, 343 (5ᵗʰ Cir. 2020). Here, Defendants Ortega and Vickers knew the other was violating Thompson's constitutional rights, were present at the scene, had a reasonable opportunity to prevent the harm, but nevertheless chose not to act and instead encouraged the violence.

**B.    NO QUALIFIED IMMUNITY**

72

96.     The test for it involves two steps which ask: (a) whether a federal or constitutional right was violated, and (b) whether the right in question was clearly established at the time of the alleged violation.  First, an officer may violate a plaintiff's Fourth Amendment rights by failing to intervene.  *Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020).  Second, it has long been clearly established that a supervisory officer may be liable under § 1983 if he or she refuses to intervene where his or her subordinates are beating an inmate in his or her presence.  *Harris v. Chanclor*, 537 F.2d 203, 206 (5th Cir. 1976) (stating the same).  Moreover, it was also clearly established that an officer may not stand by, laugh, and acquiesce while another officer uses excessive force upon a citizen.  *Hale v. Townley*, 45 F.3d 914, 918 (5th Cir. 1995) (finding the same).

## COUNT 7 – EPISODIC ACTS
*(Against All Defendants)*

97.     Thompson incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

98.     In an abundance of caution, Plaintiff also brings this episodic act cause of action in the alternative. *See* Fed. R. Civ. P. 8(d).  To establish liability under an episodic acts theory, a plaintiff need only show that: (1) a county employee violated the decedent's constitutional rights with subjective deliberate indifference, and (2) the violation resulted from a county policy or custom adopted or maintained with objective deliberate indifference. *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *127 (S.D. Tex. 2018).  Here, Defendants violated the above-described constitutional violations with subjective deliberate indifference.  That is apparent from the fact that they took Thompson to a known blind spot to beat him, and then denied him medical care for his fractured jaw for several days.  That violation resulted from the county policy or custom described above that was maintained with objective deliberate indifference.

## VII.    ATTORNEY'S FEES

73

99. Thompson incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

100. Pursuant to 42 U.S.C. § 1988; 42 U.S.C. § 12205; and 29 U.S.C. § 794a, the Thompson is entitled to recover their attorney's fees and costs.

## VIII.   JURY REQUEST

101. Thompson respectfully requests a trial by a jury of their peers on all matters triable to a jury. Plaintiff will tender the appropriate fee.

## IX.   DAMAGES

102. Thompson  incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

103. Thompson suffered the following damages as a direct and proximate result of Defendants' violations as identified above:

    a.   Actual compensatory damages;

    b.   Medical expenses incurred in the past;

    c.   Mental anguish and emotional distress;

    d.   Lost earnings capacity;

    e.   Pain and suffering;

    f.   Loss of enjoyment of life;

    g.   Violations of constitutional rights;

    h.   Pre-judgment interest;

    i.   Post-judgment interest; and

    j.   Reasonable and necessary attorneys' fees incurred.

## X.   PRAYER

74

For all the foregoing reasons, Thompson prays for judgment against the Defendants, as follows:

a.      compensatory, and special damages, as noted above;

b.      the cost of this action and reasonable attorneys' fees as provided by 42 U.S.C. §1988;

c.      pre-judgment and post-judgment interest;

d.      trial by jury; and

e.      such other and further relief, at law and in equity, that the Honorable Court deems just and equitable.

Respectfully submitted,

**THE SHARIFF LAW FIRM**

By: _____

**M. Obaid Shariff**
Federal I.D. No. 2827312
Texas Bar No. 24091135
mshariff@sharifflawfirm.com
**Kevin Acevedo**
Federal ID No. 2932922
Texas Bar No. 24086848
kacevedo@sharifflawfirm.com
2500 West Loop South, Suite 300
Houston, Texas 77027
(713) 244-8392 (Telephone)
(713) 244-8372 (Fax)
**ELECTRONIC SERVICE VIA:**
eservice@sharifflawfirm.com

**ATTORNEYS   FOR   PLAINTIFF   ROY THOMPSON**

75

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ROY THOMPSON, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:22-cv-03451 |
| HARRIS COUNTY, TEXAS *et. al.* | § | |
| | § | |
| *Defendant*. | § | |
| | § | **CERTIFICATE OF SERVICE** |

---------------------------------------------------------------------X

TO:     Clerk of the Court

I hereby certify that on the date of this filed, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and/or via email to the following:

**JAMES C. BUTT**
Sr. Assistant County Attorney
Phone: (713) 274-5133 (direct)
james.butt@harriscountytx.gov

**VERONICA L. JONES**
Tel: (713) 274-5181 (direct)
Veronica.Jones@harriscountytx.gov

**OFFICE OF THE HARRIS COUNTY ATTORNEY**
1019 Congress Houston, Texas 77002

ATTORNEYS FOR DEFENDANT HARRIS COUNTY, TEXAS AND DEFENDANT CHRISTOPHER ORTEGA

M. Obaid Shariff
*Attorney for Plaintiff Roy Thompson*

76